CLIQUOT'S CHAMPAGNE.

1. The provision in the Revenue Act of March 3d, 1863—that when foreign goods brought or sent into the United States are obtained otherwise than by purchase, they shall be invoiced at the "actual *market value* thereof at the time and *place* when and where the same were procured or manufactured"—does not mean any locality more limited than the *country* where the goods are bought or manufactured. The standard to be applied is the principal markets in that country. Hence proof of the market value in Paris of wines made at Rheims, a hundred and more miles off, may be given; there being no other evidence on the subject.

2. The provisions in the 70th and 71st sections of the Revenue Act of 1799, by which when a probable cause of forfeiture is made out to the satisfaction of the judge trying the case, the *onus* of proving innocence is thrown upon the claimant, apply to the act of 3d March, 1863, though not in terms adopted by it; neither of the said sections having been ever repealed, and this rule of *onus probandi* having been always regarded as a permanent feature of our revenue system.

3. The expression in the act of 3d March, 1863, "If any owner, consignee, or agent shall *knowingly* make an entry of goods, &c., by means of any false invoice, certificate, or by means of any other false or fraudulent document," &c., means if such person shall make such entry, &c., of

goods knowing that the invoice, &c., does not express their actual market value—swearing falsely and knowing it,—and the expression as used in the act refers to the guilty knowledge on the part of either the owner, consignee, or agent; the act of an agent or consignee being the act of the guilty principal.

4. Prices-Current obtained from the agent of a manufacturer or from dealers in the manufactured articles generally, and which have been prepared and used by the parties furnishing them in the ordinary course of their business, are so far evidence of the value of the articles mentioned in them as that they may be submitted to the jury as "throwing light" on the matter; as "some guides to candid men," and for their "consideration." And this rule was held to apply so far as that the *comparative* value, at the town of manufacture (Rheims) and at the capital of the country (Paris), of champagne wines made by one manufacturer (Cliquot), was allowed to ·be shown by the Prices-Current giving the value of that made by others (Mumm, Moet & Chandon); it not appearing—either by evidence in the case set forth in the bill of ·exceptions, or by an admission of the judge upon the bill, that such evidence was given—but that the articles were the same in price, kind, and quality.

5  Whether there is sufficient proof of agency to warrant the admission of the acts and declarations of the agent in evidence, is a preliminary question for the court.

6. Whatever is done by an agent, in reference to the business in which he is at the time employed, and within the scope of his authority, is said or done by the principal, and may be proved as well in a criminal as a civil case, in all respects, as if the principal were the actor and the speaker.

7. The proviso in the act of 3d March, 1863, that its provisions shall not apply to invoices of goods, &c., imported from any place beyond Cape Horn or Good Hope until 1st January, 1864, does not apply to cases of fraud. If the guilty means were used after the act took effect, no matter when they were prepared, the offence is complete: revenue laws not being penal laws in the sense which requires them to be construed with great strictness in favor of the defendant. They are remedial laws, rather.

As is generally known, champagne wine arrives from France in large quantities into the United States. Some of it is "imported," that is to say, persons here purchase it in France and have it brought here. Large quantities, however, are sent here by the manufacturers of the wine resident in France.

The wine region itself—the ancient province of Champagne—is a small district in the northeast of France, of

which the ancient, decayed, and deserted cathedral city of Rheims—lying to the side of the great thoroughfare of travel from Paris to Strasburgh—is the capital. The region is largely owned by particular persons, Moet and his partner, Chandon; Mumm, Heidsick, Jaqueson, and the family of Cliquot: most of whom reside about here, but who with all the leading champagne manufacturers have agencies in Paris; they themselves not commonly attending to details of the "*commerce;*" though perhaps responding—some of them—from the spot, to communications addressed to them on the subject of their wines; referring also sometimes to their agents at Paris or abroad.* Different manufacturers supply different countries, Eugene Cliquot sending large quantities to the United States, Jaqueson to Russia: different countries having different tastes.

From an early day the government has directed its attention to making the revenue laws in a form that the collection of duties *ad valorem* should operate uniformly: and by statute of March 3, 1863,† it enacts that when goods brought or sent into the United States are obtained in any other manner than by purchase, they shall be invoiced at " the actual market value thereof *at* the *time* and *place* when and where the same were procured or manufactured." And, after providing that the invoices shall be made in triplicate, and that the manufacturer shall swear to one before the consul nearest to the place of shipment, the act goes on to say (§ 1), that " if any such *owner, consignee,* or *agent* of any goods shall *knowingly* make an entry thereof by means of any false invoice, or false certificate, or by means of any other false or fraudulent document, &c., or fraudulent practice or appliance, said goods shall be forfeited :" *Provided,* " that the provisions of the act shall not apply to invoices of goods, wares, or merchandise imported from any place beyond Cape Horn or the Cape of Good Hope until the 1st of January, 1864." The operation of another part of the act pre-

---

* See *infra*, Fennerstein's Champagne, p. 145.
† Ch. 76; 12 Stat. at Large, 737.

scribing the mode of making up invoices was postponed by a part of § 1 until July 1, 1863.

The statute enacts also (§ 3) that any person guilty of *knowingly* doing what makes the goods subject to forfeiture shall be liable to fine and imprisonment.

With this act in force and with numerous persons sending champagne wines from France, the revenue officers of the United States, as it seemed from the general aspect of this case, were impressed by an idea that the invoices were below the usual French prices of the wine; and indeed that there existed perhaps an extensive combination abroad to defraud our revenue. They determined to inquire into it, and if existing, to expose and break it up. They supposed the wines to be invoiced at the cost of manufacture merely, with a fraction added; not at the " market value" of them anywhere.

They accordingly employed, as it seemed, a naval officer, Mr. Farwell, to investigate the matter secretly in France. Farwell was not a manufacturer of nor dealer in champagne wines, nor an expert as to the price of them. He never visited the champagne region, nor Rheims, of course, at all. His whole sojourn in Europe was three months, and most of his time in France was passed in Paris.

While in that city he went to the store of a certain Jean Petit & Son, whose place of business was No. 7 Rue de la Mecorcher, who had champagne wine for sale, and who stated that they were the agents of Cliquot. They were generally reputed to be such agents, and had a sign to that effect outside the door. Farwell could find no other persons acting as agents for them. Cliquot, in fact, in a deposition of his, taken at a later date, stated that this firm " was the agent for the sale of the champagne manufactured by him." Farwell examined the wines which Petit & Son had for sale, inquired the price per bottle, and also the wholesale prices of these, and of the different qualities of Cliquot's wines, for shipment to England; which prices Petit & Son stated; the same being five per cent. less than the prices named on a printed Price-Current which—not anticipating, perhaps, ex-

actly the use to which the document might be applied —
they readily gave him. The document read thus:

### PRICE-CURRENT.

#### CHAMPAGNE WINES.

Fine wines of the house of Cliquot, of Rheims, Bouzy
Mousseux, 1st quality, half dry, . . . . . Fr. 5 the bottle.
Fine wines of the house of Ellicquot, of Rheims, Bouzy
Mousseux, 1st quality, very dry, . . . . . Fr. 5   "
Fine wines of the house of Ellicquot, of Rheims, Bouzy
Mousseux, 1st quality, sweet, . . . . . Fr. 5   "
Carte Blanche Ne Plus Ultra, . . . . . . Fr. 7   "

#### WINES MARKED JEAN PETIT & SON.

Di Mosseux, half dry, . . . . . . . Fr. 3.50   "
Sillery Mousseux, half dry, . . . . . . Fr. 4   "
    "      very dry, . . . . . . Fr. 4   "
    "      rose color, . . . . . . Fr. 4   "
Bouzy et Sillery, dry, not sparkling, . . . . Fr. 5   "
Red wines of Verzenay, . . . . . . . Fr. 5   "
    Sparkling wines at very low prices for exportation. Return of duties for
the outside of Paris, or for foreign ports.

He was informed, however, that he could obtain the *wines
for exportation upon better terms from the manufacturer at Rheims.*
The highest priced wines shown him were *put up and labelled*
precisely like the best of the Eugene Cliquot wines imported
into San Francisco. Farwell inquired of several agencies
for champagne at wholesale for exportation, and the agents
uniformly stated their prices. Among the places at which
he called was the house No. 6 Provence Street, on the out-
side of which was a sign,

"Delenge Ragot, of the firm of Minet & Co., Rheims."

The proprietor here showed him samples of different
wines, stated their wholesale price, and gave him, as Mon-
sieur Petit & Son had done, a Price Current. The document,
varying from the last only in the new sorts of its principal
subject, read thus:

### PRICE-CURRENT.

Delenge Ragot, of the firm of Minet, Jr. & Co., Rheims—Paris, No. 6
Provence Street.   From 2 to 6 o'clock.

#### FINE CHAMPAGNE WINES.

| | |
|---|---|
| Carte d'Or, . . . . . . . . | Fr. 6.00 |
| Carte Blanche, . . . . . . . . | Fr. 5.00 |
| Choice Bouzy, . . . . . . . . | Fr. 4.50 |
| Excellent Verzenay, . . . . . . . | Fr. 4.25 |
| Exquisite Sillery, . . . . . . . | Fr. 4.00 |
| Partridge's Eye, . . . . . . . | Fr. 3.75 |
| Foaming, . . . . . . . . . | Fr. 3.50 |
| Superior Ay, . . . . . . . | Fr. 3.00 |
| Extra fine Tisane, . . . . . . . | Fr. 2.50 |

#### GOLD-SPANGLED CHAMPAGNE, PATENTED.

| | |
|---|---|
| Imperial, . . . . . . . . . | Fr. 6.00 |
| Excellent Boizy, . . . . . . . | Fr. 5.00 |
| Sillery, . . . . . . . . . | Fr. 4.00 |
| Verzenay, . . . . . . . . . | Fr. 4.00 |
| Ay, . . . . . . . . . | Fr. 3.00 |

Price at Rheims, package included.

Fortified with the results of his tour, Mr. Farwell came back to the United States; and custom-house officers having compared the prices at which great quantities of champagne wines sent here by foreign manufacturers were invoiced, with the prices which his two "Price-Currents" showed as prices at the places he asked at in Paris, and with other evidences of actual market value abroad, resolved to invite judicial inquiry.   They accordingly made extensive seizures of champagne, in New York, San Francisco, and other ports.

The present suit concerned the wines of Eugene Cliquot alone.   These had been made at Rheims.   The invoice was dated 5th September, 1863.   The wine itself was shipped in that same season, and arrived at San Francisco in February, 1864, where it was seized and libelled in the District Court for the Northern District of California.   The libel set forth that the owner of the champagne had consigned it to one Borel, and that Borel, by *his attorney in fact*, De Rutle, had entered it.   The charge was, that in making this entry, the consignee had "produced and used an invoice which did

not contain a true and full statement of the actual market value of said goods and merchandise at the time and place when and where the same were procured or manufactured; but that, on the contrary, as the said owner well knew, the said invoice was false, and that the market value of said goods and merchandise was much greater than the sums and prices stated in said invoice." The prosecution was founded upon the already mentioned* act of March 3d, 1863.

It is here requisite to state that, by a statute of 1799,† it was enacted (§ 70) that it should be the duty of the several officers of customs to make seizure of any goods liable to seizure, " by virtue of this *or any other* act of the United States which is now or *may hereafter be enacted,* as well without as within their respective districts." And, by § 71, that where any seizure should be made, pursuant to *this* act, " the *onus probandi* should be upon the claimant, provided probable cause was shown for the prosecution, to be judged of by the court before whom the prosecution is had."

The case was tried before Mr. Justice Ogden Hoffman and a jury—the claimant setting up in reply to proof that the wines were invoiced at cost of production (which sort of valuation the government alleged to be in violation of the statute, and ground of forfeiture), that it was proper so to value them, since Rheims was not in the least degree a commercial place, and the wines had no actual market value there; a fact denied, on the other hand, by the government, which sought to infer a contrary conclusion by proofs that the manufacturers did sometimes deal in them from Rheims itself.

However, among the facts relied on by the government, in support of their libel, were the prices in *Paris;* and with a view of getting before the jury the results of Mr. Farwell's tour, various questions were asked of him and answers made, exceptions being taken on the bill (which, however, did not set out *all* the evidence) to these particular inquiries, and the matters given in response. They were thus :

---

* Supra, p. 116.                    † 1 Stat. at Large, 768.

" What did you ascertain, if anything, concerning the price or value of Eugene Cliquot champagne? Did you ascertain what was the jobbing or wholesale price at Paris? What means did you take to ascertain the price or value, and what was the result of your investigation ?"

The witness answered:

" I went to the agents of Eugene Cliquot, Jean Petit & Son, whose place of business was No. 7 Rue de la Mecorcher. They had wines for sale, and stated that they were the agents of Eugene Cliquot, of Rheims, for the sale of his wines. They were generally reputed to be such agents, and there was a sign to that effect outside the door. I examined the wines there which they had for sale, and inquired the prices per bottle, and also inquired the wholesale prices for shipment to England and elsewhere. The agent stated to me the different prices."

The defendant's counsel objected to the witness testifying what Petit & Son stated to him in regard to the prices of champagne as inadmissible and incompetent, on the ground that it was hearsay, and that there was no evidence that Petit & Son were the agents of Cliquot, the claimant.

The court overruled the objection.

II. The witness having produced and identified the Price-Current given him by Petit & Son, the government offered it in evidence. The claimant objected on the grounds,

" That the evidence was hearsay, irrelevant, and immaterial; that the paper did not purport to state the wholesale price at Paris of the wines mentioned in it, but merely the price of a single bottle; that no actual transaction on the part of Farwell, or any one else, had been proved, or was proposed to be proved, to have been based on such paper or on the prices stated in it; that the paper had not in any manner been connected with the claimant, and that the wines mentioned and stated in the paper did not appear to be, and had not been proved to be, of the same quality as those proceeded against in this action."

The court, however, admitted the Price-Current.

III. The witness further testified:

" That almost all the leading champagne manufacturers have agencies in Paris; that he inquired of several agencies for champagne at wholesale for exportation, and the agents uniformly stated to him their prices; that he could find no agents for Eugene Cliquot at Paris, other than said house of Jean Petit & Son. That among other wine-dealers in Paris was the house No. 6 Provence Street, on the outside of which was a sign, 'Delenge Ragot, of the firm of Minet, Jr., & Co., Rheims.' That he called at said establishment, and was shown by the proprietor samples of various wines, who stated their wholesale prices; that he was also at the same time handed a printed Price-Current, which he now produced."

To this testimony the same objection was made that was made to the last; but it was received; the Price-Current being the second of those already mentioned.

IV. Farwell was also asked:

" Did you, upon inquiry at Paris, ascertain the difference in price between Rheims and Paris, as to Mumm champagne and Moet & Chandon champagne ?"

To which question the claimant objected, as calling for irrelevant and immaterial testimony; also, because it referred to champagne wines, different in kind, price and quality from those wines the subject of this suit.

But the court allowed the question.

The testimony being closed, the counsel for the claimant asked the court to give the jury the following instructions:

" 1st. That any valuation set by the claimant on his wine, or any offer by him to sell his wines at a price fixed by him, is not evidence of the fair market value, or of the usual buying and selling price of his wines, unless he was in the habit, at the place of manufacture, of selling his wines at such valuation or price."

Which instruction the judge refused to give; but charged that such offer was evidence, but not conclusive; that an isolated offer to sell had no great weight; but if corroborated

by other testimony, and in the absence of any evidence of sales or offers to sell at a lower figure, it was worthy of consideration by the jury.

"2d. That the market value, at Paris, of wines manufactured by the claimant, is not to be taken by the jury as the fair market value of the wines in controversy in this case, unless these wines were manufactured in Paris."

Which instruction the judge also refused to give; but charged, that though the value required to be stated in the invoice was the market value at Rheims, yet the market value at Paris, if established by the evidence, was a fact which might be considered as tending to show the market value at Rheims.

"3d. That the law only punishes by forfeiture the attempt to defraud the revenue or evade the duties, and, therefore, if the jury shall believe that the claimant in this case has made up his invoice of the wines in controversy through a *doubt* of the requirements of the law or of its meaning, and not with a fraudulent design, their verdict must be for the claimant."

Which instruction the judge refused to give; but charged as is hereinafter set forth.

"4th. That the invoice in this case having been made out on the 5th day of September, 1863, and the wine mentioned therein having been shipped from Bordeaux in the year 1863, therefore the act of Congress passed on the 3d day of March, 1863, is not applicable to such invoice or to the goods mentioned therein, even though the goods arrived at the port of San Francisco in February, 1864."

Which instruction was refused, on the ground that it would be an incorrect instruction.

"5th. That if there was not an actual market value, that is, wholesale market value, for manufactured champagne at Rheims, at the time the invoice of the goods in question was made out, then the claimant was justified in expressing in said invoice the value of these goods at their actual cost to the manufacturer."

Which instruction the judge also refused; but charged as is hereinafter set forth.

"6th. That the jury cannot find these wines should be for-feited, as undervalued in the invoice, unless they are satisfied that the claimant, in valuing the wines in the invoice, *fraudulently* undervalued them."

Which instruction also the judge refused; but charged as is hereinafter set forth.

"7th. That if Borel was the consignee or agent of the wine, and entered the same at the San Francisco custom-house, upon the invoice presented here, then it cannot be forfeited unless the said Borel made, or caused to be made, the said entry, knowing or believing the invoice to be false."

Which instruction also the judge refused; but charged as is hereinafter set forth.

"8th. That if De Rutle acted as agent of Borel in entering the wine upon the invoice presented here by the plaintiffs, then the wine cannot be forfeited unless the said De Rutle made the said entry knowing or believing the invoice to be false."

Which instruction the judge refused; but charged as is hereinafter set forth.

"9th. That that section of the act of Congress of March 2d, 1799, which provides, that where probable cause is shown for the prosecution, the *onus probandi* shall lie on the claimant, has no application to this cause."

Which instruction the judge refused; but charged as is hereinafter set forth.

"10th. That the word *knowingly*, in the first section of the act of March 3d, 1863, means, in connection with the language which accompanies and surrounds it, *fraudulently*."

Which instruction the judge refused; but charged as is hereinafter set forth.

The judge thereupon charged the jury at large; extracts from the charge being in substance as follows:

GENTLEMEN OF THE JURY: This case involves the inquiry as to the basis on which *ad valorem* duties are to be estimated, in all cases, upon Champagne wines.

The law of 1863, under which you are proceeding, in effect punishes the entry of goods at the custom-house, or the attempt to enter them, by means of an invoice which shall not contain a true statement of the actual market value of the goods. It is alleged here, on the part of the plaintiff, that this invoice did not contain a true statement of the market value of the goods, and on the side of the claimants it is alleged that it did. The inquiry, therefore, presents itself: What is the "actual market value," in the sense of that statute?

The market value of goods is the price at which the owner of the goods, or the producer, holds them for sale; the price at which they are freely offered in the market to all the world; such prices as dealers in the goods are willing to receive, and purchasers are made to pay, when the goods are bought and sold in the ordinary course of trade. You will perceive, therefore, that the actual cost of the goods is not the standard. On the contrary, that having been the standard, the law has been changed, and for the standard of the cost has been substituted another standard, to wit, the actual market value.

The United States insist that they have shown that the actual market value of these goods is much greater than the prices at which they are invoiced.

The defendant asserts that there is no actual market value at Rheims, the place where the goods are produced, as determined by sales; and that the only way to arrive at the market value is to take the cost of production, to compute how much the manufacturer has actually disbursed in producing the goods, and that thus you have the actual market value. The United States, however, maintain that though the manufacturer of these goods may not ordinarily sell them for consumption at Rheims, and though there may be no persons at that place who buy the goods for the purpose of disposing of them at that place, yet they are freely offered to all the world, and held at known and established rates; that they are sold by the manufacturers to any one who may apply by letters addressed to them or their agents through-

out Europe, and can be obtained, and only be obtained, at certain fixed rates, at which they are held by the producers of the goods, and at which they are ready to furnish them to all the world. If this latter state of facts be true, then it is evident that the prices at which the producers so hold them are the market prices, within the meaning of the statute, under any rational interpretation which can be given to it.

The United States have also offered in evidence various Prices-Current. These were obtained, I understand, from dealers in wines in Paris. Of course, if you believe that these merely indicate the retail prices of some grocer, or of some *cabaret*, or drinking shop, where some one sells wine by the bottle, or the half bottle, or the drink, or even two or three bottles, they will be but slight guides to you in estimating the market value of wines at wholesale. On the other hand, if they appear to be statements of the prices at which wines are held by dealers in Paris, a city which is within a few hours of Rheims, the place of production, and in some instances, if it be so, by the agents of these manufacturers themselves, then they do throw light on the market value of wines. If the place of manufacture were at San José, the prices offered or demanded here at San Francisco for wines, as indicated by the Prices-Current, would be some guide to a candid man as to the market value of the goods at San José. I am unable to see why the testimony should be rejected. It is before you for your consideration. The "price current" is, as nearly as one can get at it, the price which the manufacturer himself demands, if it is the price which his agent asks, and offers to deliver the wine for, at Rheims or at Paris.

With regard to the question of intent, I am asked to charge you that you should be convinced that these goods, if invoiced below their market value, were invoiced fraudulently below their market value. The previous statutes passed by Congress had introduced in many instances the word "fraudulently," had defined the offence to be, making a false invoice "with intent to defraud" the revenue, or evade the payment of duties. This statute, apparently *ex industriâ*, omits these expressions, and substitutes the words "if the owner," &c., "shall knowingly make an entry by means of any false invoice," &c. I do not feel at liberty, when the legislature has left out the word "fraudulent," and inserted the word "knowingly," to reinstate the word "fraudulent." At the same time I am bound to say that I can-

not conceive any case where an entry could be knowingly made by means of a false invoice unless it were fraudulently made. I do not tell you in terms that you are obliged to find that the entry was made fraudulently, but you are obliged to find that it was made knowingly by means of a false invoice; and for myself I cannot imagine any case where it could be knowingly done without being fraudulently done. What, then, shall we understand by this word "knowingly" as here employed? It is that in making out this invoice, and in swearing before the consul that such was the actual market value of the goods, the claimant knew better, and that he was swearing falsely. He forfeits these goods if you believe that he knew this invoice did not express their market value—their actual market value.

By the legislation of the United States it is established that in revenue cases, where the government has shown probable cause, the *onus probandi*, or burden of proof, is on the part of the claimants to prove the facts necessary to be shown in their defence. Under that rule of law, or rather provision of the statute, I am bound, at the request of the district attorney, to say that, in my opinion, the United States has proved probable cause, and it is for you to say whether the claimants themselves have made out their defence; whether they have shown that the goods were invoiced at their real market value at Rheims.

To that part of the charge instructing the jury that the plaintiffs having shown a probable cause, the burden of proof was on the claimant, the claimant's counsel excepted.

The jury found for the government; and the case, after judgment, came here by writ of error; it being understood that other cases, to very large amounts, and claims for back duties, would be regulated by the decision here.

*Mr. D. B. Eaton, for the claimant, Cliquot:* Beginning with the matters excepted to in the order given them in what precedes:

I. It will be observed, in regard to the three questions, which are the matter of the first exception, that they refer to no particular time or place, but comprehend all times and all places of the world, and refer to price as well as to value; that no specific brand or quality of wine is referred to, ex-

cept that the question refers to "Eugene Cliquot Champagne," and that no source of information is suggested to the witness. The "actual market value" at Rheims, or even the market *value* at Paris, is wholly disregarded.

In the third question the vagrant naval officer is asked to state what, on the whole (in his opinion, of course), was the *"result of the investigation ?"*

II. The Price-Current, said to have come from Petit & Son, is confined exclusively to *"fine* wines." The great disparity in price between the wholesale and retail prices of champagne, and between a "fine" and the average article, is well known. The paper, on its face, makes a great disparity of price between its retail price for *fine* wines in Paris and the usual wholesale price for the wines of exportation; for it says: "Sparkling wines, at *very low* prices, for *exportation.*" The two prices are placed in *contrast,* and the statement quoted from the paper adds significance to the declaration of the witness, that he was told that "he could obtain wines for *exportation* upon *better* terms from the manufacturers at Rheims."

Upon this testimony we say generally—

That upon the basis of general commercial dealing, these papers should have been treated as no standard of reference upon the question in controversy. The officer should have gone to Rheims for wholesale prices for foreign shipment, and not have confined his inquiries to the brilliant shops of an inland capital, so far away from all the highways of foreign commerce. It cannot be maintained that the great amount and average quality of wines sent for wholesale disposition to a new country like California should be presumed by the court to be of the quality one might find in Paris, that great resort of the rich, the extravagant, and the fastidious from all the nations of the globe.

It is most important, too, to note that no actual transaction was either made or proposed to be made. The inquiries of Farwell had the aspect of inquiries made *en' amateur.* He was not a dealer in champagne; not a trader of any kind.

He had not, so far as appears, even as much knowledge of champagne wines as that possessed by a man fond of them and of discriminating taste.  He walks into a shop and asks prices simply.  Petit & Son saw of course that he was an inquirer merely; one of the large class who are the pest, and not the profit, of the dealer.  Every one knows how differently any dealer talks in such a case from what he does when there is really an *affaire* on hand.  The difference is great in all countries.  It is very great in all the countries of Southern Europe, especially with foreigners, most of all English and Americans.  In Italy two prices are usually asked.  In France less, but still more than the price expected.  The theory of the practice is said to be that, in coming down from his first demand, the trader shows that he has a special esteem for his particular customer; but, whatever be the cause, the fact that a price is almost universally asked higher than will be taken from a *bonâ fide* customer,—a customer who with the cash in his hand comes to *buy*,—is notorious.  Farwell made no offer whatever to anybody.

III.  *As to the third matter:*  There is nothing to indicate that the house of Delenge, Ragot & Co., or its wines, had any relation to the wines or house of the claimant, or with Rheims even, except that the name, Rheims, appeared on the sign.  The paper was received on the theory that any paper from any Paris wine merchant proved its own contents, and was also competent and relevant evidence of the actual market value of Eugene Cliquot's wines at Rheims, in September, 1863.

It should also be noticed that neither of these Prices-Current is dated, or stated to refer to any date, nor is there anything in the record to show whether either is intended to give the current retail prices at one time or at another.  The second Price-Current shows plainly that it relates only to the retail rates of a gay, fashionable Paris café; and can have no relation to the wholesale basket market value of the common wines of exportation a hundred miles away, at Rheims.

One class of its wines is headed: "Fine Champagnes, *Carte d' Or ;*" *Excellent* Verzenay, Exquisite Sillery; the other: "*Gold-spangled* Champagnes, *Patented.*"

IV. *Fourth Exception.*—The counsel for the government seems to have been troubled withal by an impression that Paris prices, if they could be given in evidence at all, needed some testimony to accompany them, tending to show the relation they bore to prices at Rheims, and he therefore attempted to show that relation; to show, at least, the relative prices, at Rheims and Paris, of *some* of the wines mentioned in one or the other of his Prices-Current. For if he could do that, and could also be indulged in a general latitude as to the admissibility of testimony, he could argue back and forward, as to the effect that the difference in Paris and Rheims price of champagne in controversy was very likely—at least, just as likely as otherwise—the same as was illustrated, in respect to the particular kind of wines, concerning which he had made some proof. There is an answer, however, to his conclusions.

(1.) That there is no natural or logical relation between the several kinds and brands of champagne, such as to warrant the inference that there was only the same disparity of prices in the two places, as to the one, as there was as to the other.

(2.) That there is *no proof* anywhere, of the price or value of any kind or quality of wine at Rheims, except that given in the claimant's invoice, as to his own wine.

And when the counsel attempted to make his proof, he failed; because the naval officer had omitted to ascertain any fact, or even to bring any Price-Current relating to the relative price, at the two cities, of any of the kinds or quality of wines mentioned in the Prices-Current in evidence, or of the relative prices, in those cities, of the wines in controversy.

Hence "Mumm's Champagne," and "Moet & Chandon Champagne" were resorted to for the comparison deemed necessary.

This evidence was objected to, because the inquiry was

irrelative; because the testimony, if given, would be hearsay, and because the champagne referred to in the question was of a different kind, price and quality from that in controversy.

Now, adverting to this question (on p. 122), we say:

(1.) The answer would plainly be mere hearsay testimony, and open to every objection, substantial and technical, which can apply to any such testimony. It does not appear of whom, or when, or even in what part of Paris the report he is allowed to relate was heard.

(2.) The only object of it, if admissible, would be to show that if the difference in price between Moet & Chandon's wine, or Mumm's wine, at Paris and at Rheims, is any given *percentage*, that therefore only the same difference exists as to that quality of Eugene Cliquot's wine now in controversy. But the inference is unwarranted. The two selected wines might have been of the first quality, of which but a small amount was made, and that especially for the fashionable *cafés* of Paris; and in that event the market of Rheims could hardly be much below that of Paris. The facts might be very different as to other wines, such as those made especially for the English, Russian, or American markets. The evidence was designed to, and doubtless did, have the effect of causing the jury to think that they might assume the market of Paris and that of Rheims, as to champagnes generally, to be about equal. And from this basis, the jury were induced to take the unwarranted step to a verdict, viz., that all champagnes were nearly of a value, and hence, that from the rates given in Prices-Current, they might conclude that the valuations in the invoice in controversy were too low, and therefore fraudulent. Short of this argumentative process, all the testimony of the naval officer is wholly irrelevant.

To tell the jury, as the court did, that these Paris retail prices were but " some guides," that they were matter for their " consideration as candid men," and that they threw a certain " light " on the subject, does not alter the case. It was to allow them, at their option, to be guided in the ver-

dict solely by what were false guides, fanciful evidences, and illegal standards of prices and value.

The value of wines at Rheims should have been proved under a commission sent there, in which experienced merchants could have sworn as to the "*specific fact*" of the value of champagne, at the date of the invoice. How much of the testimony objected to rests on the credit to be given to Mr. Farwell? Does not his whole story rest on the veracity and competency of some other person, who gave him the Prices-Current, and on general rumors?*

Prices-Current are no doubt often admitted in evidence. But it must appear, before they are (1.) That dealers in the articles therein referred to are in the habit of giving credence to them. (2.) That it is generally understood and admitted to be a report of actual transactions and real prices.† In this case nothing of the kind appears. General advertisements in newspapers all will admit cannot be read in evidence.‡ Yet these Prices-Current are exactly what appear daily in all papers of commercial towns.

It may, indeed, be stated generally of the theory of foreign evidence on which this case was tried, that it supersedes the necessity of producing witnesses for examination or cross-examination; that it relieves litigants of the trouble and expense of sending commissions to foreign countries, as has heretofore been customary; that it avoids the labor and trouble of looking up persons who are experts in peculiar occupations, or who have personal knowledge of facts. All that need be done is to send some subaltern officer abroad, or to solicit the services of some needy tourist, who can, with little trouble and without departing from the places of fashionable resort, note in his diary the hearsay of hotels and cafés, and fill his portfolio with bills of fare and Prices-Current, touching, as near as may be prudent and

---

* See 1 Starkie on Evidence, pl. 2, § 55, pp. 180, 181; Morris v. Lessee, &c., 7 Peters, 554.

† Henkle v. Smith, 21 Illinois, 238.

‡ Sweet v. Avount, 2 Bay, 192; see also Freeman v. Baker, 5 Carrington & Payne, 475; Wetmore v. United States, 10 Peters, 647; Harris v. Panama R. R., 3 Bosworth, 7.

convenient, the matters, places, and times in controversy; and then, when any litigation arises, no preparation is needed, but a perusal of the diary and selections to match from the portfolio. "Murray" or "Appleton," we submit, would be just as good, and perhaps better evidence.

Mr. Eaton then examined articulately and with searching comment the different instructions to the jury. Many of them, he argued, were their own argument. On some he commented at large.

*Request No. 5* (*supra*, p. 123). In view of the question raised before the jury, as to there really being "an actual market value" at Rheims for the wine in question in 1863, it was necessary to give them instructions to apply, in the event that the jury should find that there was no such market value; and, therefore, the request states a rule *for that event.* We assert that this rule was necessary, and is the true one.

The statute says, the invoice must give the "actual market value *at* the place," &c., of the article invoiced. Now suppose (as this request did) there was no such market value, by reason of its being the *first of the article ever made at or near the place;* what is to be the guide or rule in making the invoice? An unknown and impossible standard, in the contingency of there being no actual market value, is laid down in the statute. What does the spirit and intent of the law require? Will the courts lay down no rule, and leave the honest manufacturer to the custom-house officer? Is there, in the nature of the case, any other rule that can be laid down in such contingency but the one stated in the request?

Let us suppose that the jury did find that the wine in question had no "actual market value" at Rheims when the invoice was made; and further, that it was invoiced at cost, then the whole verdict would depend on the ruling on this single request: "Was the manufacturer guilty of fraud or not in invoicing the wine at cost, in case there was no actual market value for it at Rheims, at the date of the invoice?" It is, therefore, a question on which this court is called upon to express its opinion.

This request for instructions goes to the foundation of the alleged fraudulent intent. If Eugene Cliquot believed he might fairly make the invoice as he did, or believed that there was no market value for champagne in Rheims; or if, in fact, there was no such market value, then no fraud can be predicated of the transaction.

*Request No. 9* (*supra*, p. 124), relates to the *onus probandi*. The judge below applied the provision of the act of 1799 to this case, and decided that the government had shown probable cause, and that, therefore, the *onus probandi* (or *desprobandi* rather, as it is), rests on the claimant.

The § 71 of the act of 1799 (the source of this doctrine of *onus probandi*) is confined to suits brought or seizures made (in its own language) " pursuant to *this* act;" *i. e.* said act of 1799. Has it been considered as applying to suits followed by seizures under any other act, except where it had been by law extended to suits thereunder? We think not. It has been decided repeatedly, in the Southern District of New York, that it did not apply to a revenue act of 1830, a statute which refers to the act of 1799, and apparently adopts it more than does the act of 1863. In one case,* Smalley, J., said:

" I have already once this term ruled that the 71st section of the act of 1799 does not apply to the act of 1830. I have not ascertained that the question has been before any court, or been passed upon; but the more reflection I have given to that question induces me to adhere to my first opinion, that the 71st section of the act of 1799 does not apply to the act of 1830. I do not think the court are warranted in extending that peculiar provision which changes the whole burden of proof from the penal statute."

It is not to be presumed that so oppressive a rule as the one in question will be extended by construction or inference. It is against the theory of the American law, and has no foundation in the general principles of justice; and there is no statute authority for applying it to an action under the act of 1863.

---

* United States *v.* 1406 Boxes of Sugar. Before Smalley, J., June 26, 1862.

*Requests Nos.* 6, 7, *and* 8 (*supra*, p. 124). The act of 1863 declares (§ 1) that if any *owner, consignee,* OR *agent* of any goods, &c., shall *knowingly* make or attempt to make any *entry* thereof by means of any false invoice, &c., or by means of any *other false* or fraudulent document, or of any *other* false or fraudulent practice or appliance, said goods, wares, or merchandise, or their value, shall be forfeited.

It should here be noticed that this section, in making *new provisions* as to *entries,* refers and relies on the old and familiar ones as to *invoices.* Hence the words "*false* invoices" and "*other* false or fraudulent appliances" are used. For the meaning of a false or fraudulent invoice, &c., we are, of course, to look to the acts of 1799 and 1830, which have been so often adjudicated.

The § 3 makes any person guilty of *knowingly* doing what makes the goods subject to a forfeiture liable to fine and imprisonment.

It may be remarked of the foregoing citation relative to the " entry," &c., from the § 1 of the act of 1863:

(1.) That it is the only clause of said act upon which it can be pretended this suit can be maintained.

(2.) That it is confined solely to wrongful *entries,* or attempts to make them, and does not forbid or attach any forfeiture or penalty to the making or to the attempt to make a false or fraudulent *invoice.* However false an invoice may be, and however fraudulent the intent with which it may have been made, no proceedings can be based thereon, and no consequences are declared to follow under the § 1 of the act of 1863.

(3.) The " owner, consignee, and agent" seem to be treated as distinct persons (at any rate, as that is the construction most unfavorable to the claimants, it will be that especially considered), so that the act of either may cause a forfeiture of the goods.

And the § 3, by the use of the words " any person," appears to make each and all of them liable to be punished criminally.

It follows, that if the act of either of the said three classes

of persons may work a forfeiture, that the act of each is to be taken as a whole and by itself. It cannot therefore be argued that what the agent *personally does* is (on any theory of the law of principal and agent) also done by the owner or consignee, by or through the agent.

The word "knowingly" clearly applies to all the means of procuring an entry to which a forfeiture is attached, as if repeated under each category. And whether the same is done by the owner, the consignee, or the agent, it must have been done "knowingly" by either, or no forfeiture is denounced.

It would seem clear that the goods cannot be forfeited by reason of the act of a consignee or agent of the owner, without proof of such acts by such agent or consignee as would render them or one of them liable to be punished criminally under the § 3. And it will not be pretended that an agent or consignee can be punished by imprisonment for " effecting an entry of any goods" for less than value, by using a false or fraudulent foreign invoice, without proof that he did it knowingly. Whatever may have been done by Borel or De Rutle, Cliquot's champagne cannot be forfeited, he having acted innocently.

*Request No. 4 (supra, p. 123), is founded on the last clause of the § 1 of the act of 1863. The language, already given, is as follows:

" And provided further, that the provisions of this act shall not apply to invoices of goods, wares, or merchandise imported into any port of the United States from any place beyond Cape Horn or the Cape of Good Hope, until the 1st January, 1864."

We contend that the meaning is, that the provisions of the act shall not apply to invoices of goods, wares, or merchandise imported into the United States from any place beyond Cape Horn or the Cape of Good Hope, when said invoices were made up at any time prior to the 1st January, 1864.

Now, what was the intent of Congress in employing and arranging these words as they are above quoted?

The act of 1863 was passed on the 3d March of that year, and the operation of that part of the first section prescribing the mode of making up the invoices was postponed until the 1st July following, for the evident purpose of allowing merchants or manufacturers in places *not* beyond Cape Horn or the Cape of Good Hope, four months' time, within which to become familiar with the new law.   The period fixed, as to such merchants and manufacturers, was reasonable and just.

It is evident then that, in the body of the first section, the date of the invoice was intended to determine the question as to whether a given case would or would not fall within the law.   By strict analogy, the same construction of the proviso must be adopted; and it must be held that the time there specified applies also to the date of the invoice, whether the strict letter of the proviso justified that construction or not.

In conclusion.  It is impossible to admire the mode in which this proceeding was begun and carried on below.   Mr. Farwell, not a manufacturer of nor dealer in champagne, no expert in its prices or qualities, and neither prepared nor intending to deal *bonâ fide,* or in fact at all, is sent abroad as a detective to ascertain the market value of it at the place of its manufacture.  He visits Paris, but not Rheims, where the manufacture is, at any time.   He gets Prices-Current of the sorts and in the way already commented on.   They are never produced till the moment of trial, when the claimant, five thousand miles away, cannot possibly answer them; however capable he may be of answering them completely.   They make "probable cause."  The rules of evidence are inverted, and the *onus* rests on the claimant to prove his innocence.

For a long series of years, may it please the court, the trade in champagne wines between this country and France has been conducted upon the basis of the present valuations. No objections have been made and no notice given to the importers that any attack upon them was to be made or that any dissatisfaction existed with their invoices.  Year after year there have been custom-house valuations based on the same theory of value as these invoices.   The shippers have

thus been led to believe that this government did not object to these valuations, and have conducted their business with unsuspecting confidence. There is reason to believe that the invoices in question were made as those for ten years previously had been, and in the exercise of good faith. Of a sudden the custom-house officers, having sent one of their number abroad and carefully laid their plans, pounce down upon the unsuspecting importer and bring him to sudden condemnation, and impose upon him immense pecuniary losses. For it is not these cases alone and the large amount they involve that you are now to decide, but other large claims for forfeitures in San Francisco and New York are depending on their issue. And there are also claims for alleged back duties of immense amount.

This case does not illustrate that theory of official action that seems liberal to the subjects of a friendly maritime state, which is bound to the United States by so many grateful memories of her noble co-operation with us in the struggle of our revolutionary birth; nor does it seem to comport with those higher and more generous principles of national intercourse, between great commercial and Christian races, which have superseded that older doctrine which treated all foreign states and subjects as in the nature of enemies, and all revenue laws as occupying a domain within which courtesy, comity and justice were unrecognized and unknown.

The motives which this proceeding charge upon the owners of these champagnes are of a most offensive character, and no such charge can be warranted or sustained, except upon clear proof. There is no such proof in the case; and the enlightened mercantile community of Europe, to whom the reputable character of the claimants is known, will not willingly accept a judgment censuring their conduct, unless it shall have better foundation than deductions from inconclusive and unauthorized testimony.

To release the property seized, and to allow the proceeding thus far to operate only as a friendly admonition to the merchants of France, will enlarge the commercial dealings

between the two nations, increase the revenues of this government from foreign imports, and illustrate our appreciation of the good will and the generous policy that should characterize the commercial intercourse of friendly nations.

Chancellor Kent declares* that the "law of nations enjoins upon every nation the punctual observances of *benevolence and good will* as well as of justice towards its neighbors. This is equally the *policy* and duty of nations." It becomes the United States, and comports best with her historic fame, to assume the highest grounds of justice and liberality in her dealings with other nations. The spirit of her foreign intercourse, and the tone of her executive and judicial administration, should never fall below the justice and equity in which her laws and her constitution are founded. Let no European merchant ever be able to say with justice that the administration of the laws of the United States is not in harmony with the spirit of that great national charter which is the wonder and the aspiration of Europe, and the guarantee and the glory of America. If there is any nation that can afford to be, and ought to be, more just and lenient than any other in the administration of her revenue laws, that nation is the United States; and there never was a fitter era than the present, when she is standing forth, great, victorious, and merciful at home, to make that honorable pre-eminence manifest to the commercial world abroad.

*Mr. Speed, A. G., and Mr. Lake, D. A. for California, contra.*

Mr. Justice SWAYNE delivered the opinion of the court.

The exceptions presented by the record will be considered in the order in which they have been argued.

I. The defendant's counsel objected to the witness testifying what Jean Petit & Son stated to him—when he visited their place of business, No. 7 Rue de la Mecorcher—in regard to the prices of champagne. The testimony is objected to as inadmissible and incompetent, on the ground that it

---

* 1 Commentaries, 32.

was hearsay, and that there was no evidence that Petit & Son were the agents of the claimant.

The bill of exceptions does not purport to set out all the evidence given in the case. Whether there was sufficient proof of the agency to warrant the admission of the acts and declarations of the agent in evidence, was a preliminary question for the court to determine. If the proof was insufficient, an exception should have been taken upon that ground, and the evidence upon the subject embodied in the bill. This was not done. It appears, however, that the proof was sufficient. Besides other evidence, the fact was proved by the deposition of Eugene Cliquot, the claimant.

Whatever is done by an agent, in reference to the business in which he is at the time employed, and within the scope of his authority, is said or done by the principal, and may be proved as well in a criminal as in a civil case, in all respects, as if the principal were the actor or the speaker.*

II. The second exception was to the admission, in evidence, of the Price-Current furnished by the agent to the witness. Coming from that source, it was clearly admissible. It was not so remote in its bearing upon the issue as to be irrelevant. Its weight and application depended upon the other evidence in the case, which is not shown. We cannot presume error. It must be made manifest. The presumption is the other way.

III. The witness further testified, that almost all the leading champagne manufacturers have agencies in Paris; that he inquired of several agencies for champagne at wholesale for exportation, and the agents uniformly stated to him their prices; that he could find no agents for Eugene Cliquot at Paris, other than the house of Petit & Son. That among other wine-dealers in Paris was the house No. 6 Provence Street, on the outside of which was a sign, " Delenge Ragot, of the firm of Minet, Jr., & Co., Rheims." That he called at this establishment, and was shown by the proprietor

---

* American Fur Co. v. United States, 2 Peters, 364.

samples of various wines, who stated their wholesale prices; that he was also at the same time handed a printed Price-Current, which he produced on the trial.

The claimant's counsel objected to the reading of the Price-Current in evidence, on the ground that it would be hearsay, irrelevant, &c.; that it gave the prices but by single bottle; that no actual transaction was based on it; that the paper was no way connected with Cliquot; and that the wines did not appear to be the same in quality with those libelled.

Was the objection well founded?

In *Lush* v. *Druse*,* the proof upon the trial, in the court below, was as follows: "A witness proved the value of wheat in Albany, in 1822, '23, '24, and '25, derived by him from the books of large dealers in wheat, at that place, he knowing nothing of the price of his own knowledge." The court said: "The proof was by a witness who had inquired of merchants dealing in the article, and examined their books. This, uncontradicted, was sufficient." With this ruling we are satisfied. While courts, in the administration of the law of evidence, should be careful not to open the door to falsehood, they should be equally careful not to shut out truth. They should not encumber the law with rules which will involve labor and expense to the parties, and delay the progress of the remedy—itself a serious evil—without giving any additional safeguard to the interests of justice. We think the Price-Current is not liable to the objection that it was hearsay. It was prepared and used by the party who furnished it in the ordinary course of his business. It is as little liable to that objection as the entries in the books of the dealer, or his answers to the inquiries of a witness, both of which were admissible upon the authority of the case referred to in Wendell. It was clearly relevant. What effect it should have, in connection with the other evidence adduced by the parties, was a question for the jury.

IV. The counsel for plaintiff asked Mr. Farwell, at the trial, whether, upon inquiry at Paris, he had ascertained the

---

* 4 Wendell, 315.

difference in price between Rheims and Paris, as to Mumm's champagne, and as to Moet & Chandon's champagne?

The question was objected to, "as calling for irrelevant and immaterial testimony; also, as calling for hearsay testimony; also, because it referred to champagne wines different in kind, price, and quality from those wines proceeded against in this action."

Whether the wines named were the same with those in question of the claimant, except in name, or not, and if they differed in quality and price, to what extent they differed, is not disclosed in the bill of exceptions. If there were such differences as was assumed by the counsel for the defendant, it should have been made to appear, by setting out either the evidence which proved it, or an admission by the judge to that effect. Either would have been sufficient. Their place cannot be supplied by the allegations of counsel. The silence of the judge does not amount to an admission. The other grounds of the objection are sufficiently answered by what has been said in considering the preceding exception.

The evidence being closed, the learned judge who presided at the trial delivered a full and able charge to the jury. It embraced all the points arising in the case. We concur with him upon all of them, except one, presently to be considered, and upon that the charge was more favorable to the party defending than he was entitled to claim. The counsel for the claimant submitted ten prayers for instructions; all of which were refused, and he excepted. As the charge of the judge covered the entire case, and is satisfactory to this court, we might, consistently with the rule of law upon the subject, forbear to enter upon their examination in this opinion.* But as some of them involve new and important questions, and all of them have been pressed upon our attention with zeal and ability, and we have considered them with care, we deem it proper briefly to state our conclusions.

The term "*place*," as used in the first section of the act

---

* Law *v.* Cross, 1 Black, 533.

of 1863, does not mean any locality more limited than the *country* where the goods are bought or manufactured. The standard to be applied is their value in the principal markets of that country. The commerce into which they enter is international, and the language of the statute must be construed in a large and liberal spirit. Proof of the value of the wines at Paris, if there was no other evidence upon the subject, was sufficient to enable the jury to arrive at the proper conclusion. Upon this point our opinion differs from that of the learned judge who tried the cause.

It is argued that the rule relating to *probable cause*, and the *onus probandi*, prescribed in the seventy-first section of the act of 1799, is confined to prosecutions under that act, and has no application to those under the act of 1863, which is silent upon the subject.

It would be a singular result if, in a prosecution upon an information containing counts upon this and later statutes *in pari materiâ*, the rule should apply to a part of the counts and not to others. The seventieth and seventy-first sections must be construed together. They both look to future and further legislation. In all the changes which the revenue laws have undergone neither has been repealed. The authority to seize out of the district of the seizing officer, and this rule of *onus probandi* have always been regarded as permanent features of the revenue system of the country. This act is the only one ever passed containing this rule. All the later laws are silent upon the subject. In *Wood* v. *United States*,* the court below instructed the jury that the rule applied in a trial upon an information founded upon the acts of 1799 and the act of July 14, 1832. No discrimination was made between the counts. This court sustained the instruction. In *Taylor* v. *United States*,† in *Clifton* v. *United States*,‡ and in *Buckley* v. *United States*,§ the informations were founded upon certain sections of the acts of 1799, 1830, and 1832. The court below applied the rule alike to all the counts.

---

* 16 Peters, 342, 360.          † 3 Howard, 197, 203.
‡ 4 Howard, 242.               § 4 Id. 252, 257, 260.

The same result followed in this court as in the case of *Wood* v. *United States.* In none of these cases was the point here under consideration *expressly* made. The applicability of the rule alike in cases arising under *all the revenue laws* was assumed by the eminent counsel concerned and by the court. Other questions relating to the subject were fully discussed. This tacit recognition is equivalent to an express declaration.

The term *knowingly,* in the act of 1863, in the connection here under consideration, refers to the guilty knowledge of the owner, consignee, or agent, by whom the entry is made, or attempted to be made. The offence to be punished consists of three particulars: (1.) The making, or attempting to make, an entry by the owner, consignee, or agent. (2.) The use by such owner, consignee, or agent, of the forbidden means. (3.) Guilty knowledge on the part of such owner, consignee, or agent. This, we think, is the proper construction.

It is asserted, as a consequence, that if the owner is guilty, and the entry is made by an innocent consignee or agent, the case is not embraced by this statute. We cannot yield our assent to this view of the subject. In that case the act of the agent or consignee is to be regarded as the act of the guilty principal, and the same penal consequences follow as if the entry had been made by the owner in his own person.

The court below was pressed to instruct the jury that "*knowingly*" is used in the statute as the synonyme of *fraudulently.* The instruction given was eminently just, and we have nothing to add to it.

The provision that the act should not apply to invoices of goods imported into any port of the United States from beyond Cape Horn, or the Cape of Good Hope, until the 1st of January, 1864, does not affect this case. Its meaning is that the requisites prescribed by this act for foreign invoices, in order to secure the entry of the goods at a port of the United States, need not be complied with in the cases mentioned until the time specified. It does not apply to cases of fraud, and gives no impunity to guilt. If the guilty means

named in the statute were used after it took effect, no matter when they were prepared, the offence was complete. Revenue laws are not penal laws in the sense that requires them to be construed with great strictness in favor of the defendant. They are rather to be regarded as remedial in their character, and intended to prevent fraud, suppress public wrong, and promote the public good. They should be so construed as to carry out the intention of the legislature in passing them and most effectually accomplish these objects.*

JUDGMENT AFFIRMED.

---

* Taylor v. United States, 3 Howard, 210.

