**THE WAALHAVEN.**

**POTASH IMPORTING CORPORATION OF AMERICA v. MAATS et al.**

District Court, S. D. New York.
Sept. 6, 1932.

Single & Hill, of New York City (Robert E. Hill and C. Welmore Robinson, both of New York City, of counsel), for libelant.

Hunt, Hill & Betts, of New York City (John W. Crandall, of New York City, of counsel), for claimant and respondents.

KNOX, District Judge.

This is a motion by libelant for an order sustaining its exceptions to the commissioner's report.

The commissioner reported that libelant had failed to establish a market value at Jacksonville for sulphate of potash and sulphate of potash magnesia, and concluded, in accordance with claimant's contention, that libelant's damages "should be confined solely to the contract or invoice price of the goods less quantity discount." The commissioner further found the proof of replacement of the

damaged goods to be insufficient, and, therefore, reported that libelant was not entitled to the items claimed as port charges.

■ In my opinion, these conclusions are erroneous. As is well established, the ordinary measure of damages in cases of this sort is the market value of the goods at the place of destination. Sedgwick on Damages (9th Ed.) §§ 495, 849. One reason for this rule is that the consignee of lost or damaged goods may replace the same in the open market, at a fair price, and that the cost of so doing should be borne by him who has breached his contract to make a good delivery. It is not necessary, however, that the consignee actually replace the goods. He may choose not to do so for a variety of reasons, and the wrongdoer is in no position to require such action. Replacement is a theory of damages —not a factual requirement. It is applied where goods are designed for *use* at the place of destination—as is the fact in the case at bar, where it is clear that the cargo of potash was intended as a whole, for use and not for resale. Thus, Mr. Haynes, the president of Wilson & Toomer Fertilizer Company, which was the purchaser of the cargo, testified that: "By far the largest part of our potash purchases are used in the manufacture of completed fertilizers, rather than selling as potash." (Libelant's Exhibit 14, p. 68). It is the market value with a view to replacement, therefore, that concerns these litigants.

■ The commissioner felt himself unable to find the existence of a market value for potash at Jacksonville, in April, 1927, inasmuch as none of the witnesses cited specific sales of potash at or about that time, and further that there was no exchange upon which such market value was or could be registered. It appears, nevertheless, that some 200,000 to 300,000 tons of spot potash were sold annually within the district to which respondents' ship was obligated to deliver the cargo in question. And, while sales may furnish evidence of market value, the sums at which they are consummated do not exclude other means of establishing such value. See Alfonso v. United States, Fed. Cas. No. 188; Heiner v. Crosby (C. C. A.) 24 F.(2d) 191. In the latter case, where there was a question as to the fair market price of certain stock, within the meaning of Revenue Act 1916, § 2, subdivision (c), 39 Stat. 757, and Revenue Act 1917, § 1200, subdivision (a), 40 Stat. 329, the court said at page 193 of 24 F.(2d): "Offers made in good faith and opinions of intelligent men experienced in the business are admissible to show fair value."

In Rice v. Eisner (C. C. A.) 16 F.(2d) 358, the "bid and asked" quotations from a financial journal were held to be competent evidence of the value of corporate stock.

■ In Cliquot's Champagne, 3 Wall. (70 U. S.) 114, 18 L. Ed. 116, Prices-Current obtained from dealers in Champagne wine were held to be competent evidence of the market value of various wines in France. Similarly in the case at bar, libelant's list prices and the opinions of the witnesses, Edwards, Haynes, and Trueman were competent evidence of market value. Since the credibility of these witnesses was in no way impeached, and since they all employed the same method in arriving at market value (although they differed slightly in specific figures), there is no reason why their opinions should be disregarded in arriving at market value.

The commissioner further stated: "I am convinced that in the spring of 1927 the libellant as sole agent of the German potash syndicate, had for some time been in exclusive control of the potash market in the south."

That the libelant was the largest importer of potash, and dominated the market to a great extent, cannot be doubted. But the proof falls far short of showing that it possessed an absolute monopoly. The strongest testimony in this regard was that of Mr. Haynes, who stated, in answer to the question whether libelant had a monopoly: "Practically speaking. There was some production by the French and my recollection is at that time possibly the French were marketing a small quantity of that in this country."

As opposed to this indefinite reply, there is the unequivocal statement of Mr. Trueman, president of the Trueman Fertilizer Company, that, "We bought our entire requirement from the French Syndicate." The somewhat varying testimony with respect to price fixing agreements between the French and German syndicates is based entirely upon hearsay, and is insufficient to prove that there was no competition between the two. The evidence given by Messrs. Outler and Sublette merely shows that the last potash cargo brought into Jacksonville by the French Syndicate was at the end of the year 1926, or in January, 1927. But, neither witness knew what may have been imported into southern ports other than Jacksonville, and through other shipping agents.

As contended by respondent, it may well be that the producers of potash in Western

United States were driven out of the southern market by libelant, but if libelant's dominant position in that market was achieved by its ability to undersell the western producers, as testified by Trueman (Libelant's Exhibit 14, at page 107), it can in no fair sense be said that libelant had a monopoly in the pernicious sense of the word. Presumably, if libelant raised its prices too high, western producers and those in other countries would be able to come into the southern market.

The fact that libelant published price lists, and that the various witnesses used the prices therein contained as a starting basis for their computations of market value, does not indicate the absence of a market value. According to Mr. Trueman, there was always a demand for sulphate of potash and sulphate of potash magnesia in the manufacture of fertilizer, and this testimony is in no way questioned or contradicted.

Since there is lack of proof of real monopoly, since there was a constant demand for the goods, and since the witnesses Edwards, Trueman, and Haynes were all in accord as to the manner in which the market value should be computed, there is no reason why one should not be found to have been in existence.

If libelant had been required to replace the goods either from its own supply of spot goods at its warehouses, or by purchase from one of the large fertilizer manufacturers, it would have had to pay the various items of expense included in the port charges. If it had purchased from a manufacturer, it would also have had to pay a price that would give the manufacturer a profit. Since, however, the price would have been that enacted for wholesale quantities, the profit to be included in such damages as may be assessed against respondent should be the lowest as to which testimony was given, viz., 5 per cent. Even if libelant had taken the goods from its own warehouses, it would have been deprived of the normal wholesale profit that otherwise would have accrued had it made a sale of the goods to one of the smaller manufacturers of fertilizer. Thus, in either event, libelant should recover 5 per cent. profit in addition to the port charges. These two items, therefore, should be added to a base consisting of the list price, minus the 10 per cent. quantity discount. The quantity discount should be deducted because the market price was computed by allowing a certain profit over the costs; and the cost of the materials was not the list price, but was the list price, minus the quantity discount.

As stated before, it is not necessary to show that a replacement was actually made, or how it was made. It is enough to show a market value by which the cost of replacement can be measured.

Libelant, therefore, is entitled to the following recovery:

| | | |
|---|---|---|
| 567,060 kilos kainit in bulk 623.8 tons @ $9. a ton, less 10% discount, | $ 5,052.78 | |
| plus charges of $2.20 per ton, | 1,372.36 | |
| plus 5% profit ($.51½ per ton), | 321.26 | |
| | | $ 6,746.40 |
| 2,000 bags sulphate potash magnesia, weight 422,061 lbs., 211.03 tons @ $27. a ton, less 10% discount, | $ 5,128.13 | |
| plus charges of $2.20 per ton, | 464.27 | |
| plus 5% profit ($1.32½ per ton), | 279.61 | |
| | | 5,872.01 |
| 5,500 bags sulphate potash, 576.83 tons @ $46.85 a ton, less 10% discount, | $24,322.04 | |
| plus charges of $2.20 a ton, | 1,269.03 | |
| plus 5% profit ($2.22 per ton), | 1,280.26 | |
| | | 26,871.33 |
| Total | | $39,489.74 |
| Less salvage | | 11,134.34 |
| | | $28,355.40 |

The commissioner was correct in disallowing interest for delay on the value of the entire cargo, since it does not appear that there was any delay in payment of the purchase price to libelant. With regard to interest on the lost and damaged goods, the commissioner's conclusion that it should run from the date of *actual* delivery, rather than from the date of intended delivery, will not be disturbed, since libelant could not have suffered any pecuniary loss prior to the earliest date on which it could have been called upon to replace the cargo, namely, the date of actual delivery.

Libelant may have a decree for $28,355.-40, with interest on $21,609 from April 18, 1927, and interest on $6,746.40 from April 11, 1927.

Libelant's exceptions numbered 4, 7, 8, 9, and 11 are sustained. All other exceptions are overruled.