**UNITED STATES of America**

v.

**John C. PARENTI.**

**Crim. No. 23204.**

United States District Court,
E. D. Pennsylvania.
March 31, 1971.

L. C. Bechtle, U. S. Atty., Philadelphia, Pa., for plaintiff.

Benjamin R. Donolow, Philadelphia, Pa., for defendant.

## OPINION

TROUTMAN, District Judge.

Following an extended trial by jury, the defendant was found guilty of attempting to evade and defeat the payment of his 1961, 1962 and 1963 income taxes in violation of 26 U.S.C. § 7201. The defendant now seeks a judgment of acquittal or, in the alternative, a new trial. In support of his motion, the defendant has submitted an extended brief raising multiple points not all of which are wholly consistent and some of which are partially duplicitous. We shall treat each point seriatim:

## I.

The defendant first contends that the Court erred in denying the defendant's motion for inspection and disclosure by the Government of all exculpatory material, information and evidence. Relying heavily upon Brady v. Maryland, 373 U. S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the defendant contends that the Court erred "in not requiring that the Government go through its file, and produce any and all exculpatory matter that may exist therein, and give same to the defendant as was requested" [1]. He otherwise contends that " * * * a defendant is entitled, as a constitutional right, to have any and all exculpatory material made known to him where such material or witnesses are known to the Government" [2]. In another instance the defendant contends that it was the duty of the Court to require the Government "to expose its entire file" to the Court, "and it was then the duty of the Court to see if there was contained therein any material which could possibly be beneficial to the defendant, and * * * to require that the Government turn over all af this material to the defendant" [3].

Apparently, the defendant neither suspects nor knows of the existence of any such "exculpatory material" in the possession of the Government either now or at the time of trial. On the contrary, the Government represented and presently represents that it had and has no exculpatory material or evidence in its possession or control [4].

---

1. See page 16 of defendant's brief.

2. See page 12 of defendant's brief.

3. See page 17 of defendant's brief.

4. See page 9 of Government's brief.

The defendant contends that the law relating to deliberate or bad faith suppression of evidence by the Government, of which there is no evidence, or its refusal to honor a proper request to produce, of which there is no evidence, somehow obligates the Government to expose its entire file to the defendant or at least to the Court for inspection and possible delivery to the defendant. The cases do not so hold. Certainly *Brady*, which involved a charge of murder and, the extra-judicial confession of an accomplice, did not suggest exposure of the Government's entire file. United States ex rel. Thompson v. Dye, 3 Cir., 221 F.2d 763 (1955), likewise a murder charge, involved the suppression of evidence regarding the defendant's state of intoxication. United States ex rel. Butler v. Maroney, 3 Cir., 319 F.2d 622 (1963) involved a statement given by the defendant to the police regarding a struggle between the defendant and the victim at the time of the shooting. While the *Brady* doctrine has been refined in subsequent decisions, no case suggests that the defendant has the right, or the Court the obligation, to peruse, the Government's file to determine whether exculpatory material or evidence is contained therein. United States v. Keogh, 2 Cir., 391 F.2d 138 (1968); United States v. Miller, 2 Cir., 411 F.2d 825 (1969); Barbee v. Warden, 4 Cir., 331 F.2d 842 (1964); United States v. Manhattan Brush Company, D.C., 38 F.R.D. 4. The interests of justice would not be served by allowing the defendant unlimited access to and perusal of the Government's entire file, especially where, as here, the defendant knows of no exculpatory evidence which has been suppressed and the Government affirmatively represents that it has none.

## II.

Using the so-called "net worth method", the Government procured from the defendant's accountant, to whom the Government agents were directed and referred by the defendant, a net worth statement, cash flow sheets, summary sheets and statement. (G–231, 232, 235, 236, 238, 239, 240 and 243.) To the use and admission of these documents, and particularly the net worth statement (G–243) the defendant objects, contending that when the investigation became criminally oriented and focused upon the defendant, he was entitled to the *Miranda* warnings. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Defendant concedes [5] that the present state of the law does not require the *Miranda* warnings where, as here, there was no "custodial" interrogation. However, he argues that the rationale of *Miranda* and related cases suggests that the Government owes to an individual who is suspected of income tax evasion some type of warning advice or notice albeit something less than the *Miranda* warnings. However, all cases relied upon by the defendant involve either active deception by Government officers (or agents) or custodial interrogation. The defendant's contentions have been overwhelmingly rejected by a great majority of the Courts. The basis for such rejection is best stated in the case of United States v. Squeri, 2 Cir., 398 F.2d 785 (1968), where at page 790 the Court said as follows:

"Thus, we reject the view * * * that I. R. S. agents must give the *Miranda* warnings even though there is no custodial interrogation, if the investigation has reached the accusatory stage * * *. The Fifth Amendment privilege prohibits the government from compelling a person to incriminate himself. *It was the compulsive aspect of custodial interrogation, and not the strength or extent of the government's suspicions at the time the questioning was conducted, which led the court to impose the Miranda requirements with regard to custodial questioning.* We believe that the presence or absence of compelling pressures, *rather than the stage to which*

---

5. See pages 24 and 25 of defendant's brief.

*the government's investigation has developed*, determines whether the *Miranda* requirements apply to any particular instance of questioning." (Emphasis ours.)

The so-called "focus" test seems to have originated in Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1963), and was rejected by the *Miranda* Court which reasoned as follows, 384 U.S. at page 444 (Fn. 4), 86 S.Ct. at page 1612:

"* * * questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way * * *

* * * * * *

"* * * is what we meant in *Escobedo* when we spoke of an investigation which was focused on an accused * * *". (Emphasis ours.)

In United States v. Jaskiewicz, 3 Cir., 433 F.2d 415 (1970), also an income tax evasion case, the Third Circuit more recently rejected the "focus" test. In Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968), the taxpayer was in custody on an unrelated charge and the Government sought to apply the "focus" test in determining whether the defendant was entitled to the *Miranda* warnings. The Court rejected the Government's argument and applied the "custody" test. Likewise, see Orozco v. Texas, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969); Kohatsu v. United States, 9 Cir., 351 F.2d 898 (1965), cert. denied 384 U.S. 1011, 86 S.Ct. 1915, 16 L.Ed.2d 1017 (1966), rehearing denied 385 U.S. 891, 87 S.Ct. 15, 17 L.Ed.2d 122 (1966). To hold otherwise would violate the clear language of the *Miranda* court, 384 U.S. at page 477, 86 S.Ct. at page 1629:

"* * * Our decision is not intended to hamper the traditional function of police officers in investigating crime * * * seek(ing) out evidence in the field * * *. Such investigations may include inquiry of persons not under restraint * * *. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present * * *".

■ The defendant in the instant case, having completed an eighth grade education, was engaged in several businesses and had retained the services of a qualified, able and reputable accountant with whom the Government agents dealt at the direction and request of the defendant. The defendant may safely be designated an "ordinary taxpayer". Therefore, the following language used by the Court in United States v. Sclafani, 2 Cir., 265 F.2d 408, 414, 415 (1959) becomes particularly pertinent:

"A 'routine' tax investigation openly commenced as such is devoid of stealth or deceit because the ordinary taxpayer surely knows that there is inherent in it a warning that the government's agents will pursue evidence of misreporting without regard to the shadowy line between avoidance and evasions, mistake and willful omission.

"Moreover, it is unrealistic to suggest that the government could or should keep a taxpayer advised as to the direction in which its necessarily fluctuating investigations lead. The burden on the government would be impossible to discharge in fact, and would serve no useful purpose."

In United States v. Prudden, 5 Cir., 424 F.2d 1021, at page 1033 (1970), the Court said:

"* * * We conclude that mere failure of a revenue agent (be he regular or special) to warn the taxpayer that the investigation may result in criminal charges, *absent any acts by the agent which materially misrepresent the nature of the inquiry, do not constitute fraud, deceit and trickery* * * *". (Emphasis ours.)

There is no evidence that the nature of the inquiry was misrepresented and no evidence of fraud, trickery or deceit. Absent such acts no obligation was imposed upon the agents to warn the defendant

of the possible outcome of the investigation. In Spahr v. United States, 9 Cir., 409 F.2d 1303, at page 1306, the Court said as follows:

"* * * If the agents procured their invitation through guile or fraud, the * * * examination would constitute an unreasonable search * *. We find no deception. Agent Byerly identified himself as a special agent from the Intelligence Division * * ".

Likewise, see United States v. Frank, 245 F.2d 284 (1957) and United States v. Wheeler, 256 F.2d 745 [6], where at page 746 the Court stated:

"The investigation thus concluded with exactly what is a foreseeable result of any income tax return audit, should the audit develop evidence of fraud".

Also see the more recent case of United States v. Jaskiewicz, *supra*.

■■ Guile, trickery, fraud and deceit are simply not in this case. They exist where an agent either affirmatively misleads the taxpayer or his agent, or where he misrepresents something or fails to disclose something which he has a duty to disclose. The extent of the investigation need not be disclosed. United States v. Jaskiewicz, *supra*. Here, the Government agents, at defendant's request, dealt with the defendant's accountant, who acted as defendant's attorney in fact. The defendant knew, as did his accountant, that if an audit of records disclosed evidence of fraud the Government would act accordingly. This is a "foreseeable result of any income tax return audit". United States v. Wheeler, *supra*. The defendant, seeking to establish guile, fraud, deceit and trickery, points, for example, to the agents' request that the accountant submit to the defendant, for his approval and signature, the net worth statement (G–243). This was not trickery or deceit. Had such statement not been submitted to the defendant and had the Government proceeded without determining whether

the defendant was satisfied with or approved its contents, the defendant might more logically allege fraud or deceit. It is evident that the Government took the only course which was fair to the defendant and to those representing him.

■ Additionally, the defendant contends that he was misled or deceived because on a prior occasion (a prior year) a civil settlement was made by the Government after audit and that the defendant, therefore, had no reason to suspect that a criminal prosecution would follow the audit here involved. The defendant's experience or lack of experience with prior prosecutions cannot be either the basis for a charge of fraud and deceit, or the basis for the *Miranda* warnings.

■ Neither is there any basis for the defendant's contention that the accountant should have received the *Miranda* warnings or that he was "deceived and misled into believing that the matter could be resolved on a civil basis and that the Government did nothing to dispel that belief" [7]. The accountant's state of mind can hardly be the basis for an allegation of fraud and deceit. In like circumstances, any accountant, and his client, would hope that the matter could be and subsequently would be resolved on a civil basis. Indeed, the Government might well hope for the same result. That the results were otherwise cannot be the basis for a broadside charge of fraud, deceit, trickery and misrepresentation. We find these and similar contentions advanced by the defendant to be without merit. Fraud, deceit, trickery and misrepresentation are not and never were in this case. Moreover, the *Miranda* warnings, as already stated, are not required in the absence of a custodial interrogation or absent "any form of restraint upon his freedom of action". See the case of United States v. Jaskiewicz, 433 F.2d 415, 420 (3rd Cir. 1970) which was likewise an income tax evasion case, and where the defendant advanced contentions similar, if not

---

6. Both cases from the Third Circuit.

7. See page 27 of defendant's brief.

identical, with the contentions here advanced. There, as here, information was obtained from the defendant's accountant. There, as here, the Government followed routine investigative procedures, involving the usual audit of the defendant's records followed by a reference to a Special Agent of the Intelligence Division when fraud was suspected or discovered. There, as here, the defendant contended he was entitled to the *Miranda* warnings. The Court squarely rejected the defendant's contentions and affirmed the conviction. Therefore, the defendant's contentions are without merit.

### III.

■■ The defendant contends that it was error to have allowed the Government to introduce evidence as to preprosecution years' income and expenditures by the taxpayer. Consideration of this and other issues requires a careful study of Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150. That and subsequent cases dealing with the net worth method of proof have prescribed certain principles designed to protect the defendant taxpayer and to assure that the innocent will not be improperly convicted on the basis of circumstantial evidence. Among others they are:

(a) the establishment with reasonable certainty of an opening net worth to serve as a starting point from which to calculate future increases in the taxpayer's assets;

(b) the Government's investigation of leads furnished by the taxpayer as to the possible source of his assets; the negation of reasonable explanations by the taxpayer inconsistent with guilt. When the Government fails to show an investigation into the validity of such leads they may be considered as true and the Government's case held insufficient. This aids in forestalling unjust prosecutions and relieves the defendant of the dilemma of having to come forward with such proofs at the risk of an adverse verdict. This is consistent with the Government's duty to see that justice is done at the possible expense of a conviction;

(c) the production of evidence to support the inference that the defendant's net worth increases are attributable to currently taxable income. Increases in net worth, standing alone, cannot be assumed to be attributable to currently taxable income. But, proof of a likely source, from which the jury could reasonably find that the net worth increases sprang, is sufficient;

(d) the burden of proof remains upon the Government. The practical disadvantages to the taxpayer are lessened by the pressures on the Government to check and negate relevant leads. Likewise see Friedberg v. United States, 348 U.S. 142, 75 S.Ct. 138, 99 L.Ed. 188 (1954).

The Government sought to comply with the dictates of *Holland,* as it was obliged to do, by the introduction of evidence as to pre-prosecution years' taxpayer income and expenditures. After vigorously contending that the net worth statement and cash flow statements were legally inadmissible, inaccurate and incompetent, (subdivision II, supra) the defendant now contends that they sufficiently established an opening net worth and starting point from which to calculate future increases in taxpayer's net worth and that evidence of pre-prosecution years' income and expenditures was improper. The inconsistency in the defendant's arguments demonstrates the burden resting upon the Government which it could meet only by the production of the evidence here attacked.

Further answer to the defendant's contention rests in the fact that by proving pre-prosecution years' expenditures and income, the Government thus fortified its contention that the defendant's financial resources prior to the prosecution years were such that he could not have amassed a greater store of wealth than that credited to him in the net worth statement. This bolstered the truthfulness of and thus corroborated the post-offense admissions contained in G–243 and thereby established a reasonably

firm "starting point" as required by law. Consequently, the Government not only had the right, but, indeed, the duty to offer and introduce evidence relating to pre-prosecution years' income and expenditures which the Government proved for the years 1952 through 1960, all prior to the indictment period (G–325 and 326). A computation of these (G–237) showed an unaccounted-for sum which, obviously, the jury believed was spent during those prior years by the defendant for his and his family's personal. living expenses. Such non-deductible expenditures are generally not capable of direct proof.

■ It is not necessary that corroboration evidence, in and of itself, prove the alleged crime beyond a reasonable doubt or by a preponderance of the evidence. It is necessary only that it bolster the truthfulness of the admissions themselves and thereby, together with the admissions, prove the alleged offense beyond a reasonable doubt. Smith v. United States, 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192 (1954).

Additional answer to defendant's contention presently under consideration is found in counsel's opening remarks to the jury which *immediately* followed those of the Government. He spoke of income "in the years prior to 1961". He spoke of money "accumulated * * * prior to 1961". He spoke of pre-1961 "savings". He spoke of "moneys for the previous years" expended during the taxable years in question. He spoke of money "accumulated" that is "non-taxable". He spoke of money or savings "put away under your mattress, under your rug, in your safe deposit box, wherever you had it". He spoke of "borrowed money" and he said, "Now, we will show moneys borrowed, we will show moneys accumulated, and we will show these were the moneys that were spent" [8]. That he didn't do it is of no consequence. That he *said it constituted the lead or leads* which the Government followed and which, for this and other reasons, result-

ed in the introduction of the evidence of which the defendant now bitterly complains.

■ For the purposes of the present argument and inconsistent with the record, the defendant, through his counsel, now states: "It is also extremely vital to note that the defense never contended that it had any cash hoard on hand. On the contrary, the defense, in general, agreed that the starting point for the cash on hand as of January 1, 1961, was exactly what appears on the face of the Government exhibits" [9]. We knew and now know of no such "general agreement". Moreover, it is regrettable that the defendant's position at the inception of the trial was so poorly stated. It is doubtful, but barely possible that weeks of testimony might have been eliminated. Whatever the cost, in time and otherwise, the fact remains that the procedures outlined in *Holland* were properly followed, " * * * a procedure entirely consistent with the position long espoused by the Government, that its duty is not to convict but to see that justice is done". (348 U.S. p. 136, 75 S.Ct. p. 136) In the light of the "leads" contained in the opening remarks of counsel, "which, if true, would establish the taxpayer's innocence", the Government could not risk the admonition contained in *Holland* that, absent an investigation of such leads by the Government, "the trial judge may consider them as true and the Government's case insufficient to go to the jury". (P. 136, 75 S.Ct. p. 135) Here, as there, "The Government's detailed investigation was a complete answer * * * ". (P. 136, 75 S.Ct. p. 136) Taxpayer's income and expenditures for pre-prosecution years were properly admitted.

### IV.

The defendant contends that the Court erred in admitting into evidence G–304, a document which showed the payment, in a pre-prosecution year, of a fine in

8. See pages 20 and 21 of the record.

9. See page 32 of the defendant's brief.

the amount of $569.25 and the forfeiture of the sum of $1940.50. Contrary to the record, he once again argues that pre-prosecution year expenditures were improperly admitted since "there was no allegation by the defense of a 'cash hoard' at the starting point of the year in question" [10]. Our previous discussion of pre-prosecution expenditures clearly establishes that compliance with the decision in *Holland* and other cases permitted of no other course.

■ The defendant further contends that G–304 was inadmissible because it represented evidence of a criminal offense. But, it was not the only evidence of record pertaining to defendant's gambling activities. Therefore, its probative value for the purpose admitted, clearly outweighed any prejudicial effect. The evidence must be viewed in qualitative rather than quantitative terms. Moreover, it was not admitted for the purpose of proving a crime. It was admitted to show an expenditure. That it incidentally showed a prior offense, involving gambling activities of which there was other evidence is of no moment. In United States v. Stirone, 3 Cir., 262 F.2d 571 (1958), the Court stated:

"* * * Evidence of other offenses may be received if relevant for any purpose other than to show a mere propensity or disposition on the part of the defendant to commit the crime".

G–304 represents an expenditure of approximately $2500.00 in the year in question. It was only part of a vast amount of evidence offered by the Government to counter the defendant's references to prior accumulations, savings, loans, etc., whether under the "mattress", under the "rug", in the "safe deposit box" or otherwise. The language used by the *Third Circuit* in the case of United States v. Caserta, 199 F.2d 905, at 909 (1952), is particularly applicable:

"* * * Another complaint of the defendant is that the government introduced evidence of other offenses.

This testimony was to the effect that the defendant had paid fines for the violation of state laws on two occasions. The defendant now says that this was erroneous and cites the well-known rule to the effect that a man is not to be convicted of one crime by evidence showing that he has been convicted of another. That was not the reason for the use of the testimony in this case. The prosecution was endeavoring to show what the defendant spent his money for. It might have been theater tickets, it might have been automobiles (as it was), or a boat (as it was) or paying it out to the Commonwealth of Pennsylvania in fines. If part of defendant's income was spent for this purpose the Government may show it as part of the picture of defendant's expenditures which it was required to make. There is nothing to the defendant's point."

■ Contrary to defefndant's contention, G–304 was not inflammatory. It was not inflammatory standing alone and certainly not inflammatory in the light of the entire record. It sufficiently identified the defendant by name and place of business. It was properly admitted. To have allowed the Government to *thereafter* produce, as attempted, a police officer to point his finger at the defendant and again identify him in open court was unnecessary, may have been inflammatory and would, we believe, have been prejudicial. Therefore, we sustained the defendant's objection to the testimony of such police officer. *He* now *complains* that we did so. The defendant's connection with the expenditure represented by G–304 was adequately established on the face of the exhibit. The jury could accept it or disregard it. The defendant properly objected to the proposed testimony of the arresting police officer and we believe the Court properly sustained the defendant's objection. Had we not done so the defendant would continue to allege error.

10. See page 36 of defendant's brief.

## V.

The defendant contends that the Court erred in admitting into evidence G–90. Said exhibit recites as follows:

"December 6, 1962

"This is to duly swear that I, John Parenti, of 736 South 25th Street, Allentown, gave to Fred Mathern in the year of 1961 various sums of money totaling Six Thousand Nine Hundred Dollars ($6,900.00).

"/s/ John C. Parenti

"Sworn to and subscribed before me this 7th day of December, 1962
/s/ Charles Ward
Bethlehem, Pa.
My Commission expires 11/18/63".

The defendant's signature was established by a duly qualified handwriting expert. (Notes of testimony, page 1850 et seq.) The defendant offered no evidence to the contrary. G–90 was properly admitted. Whether it was a gift, a loan or some other type of transaction which can be conjured up by one's imagination was for the jury. The document, duly signed by the defendant, speaks for itself. It was for the jury to interpret it. The Government was under no obligation and indeed had no right to offer interpretative evidence after establishing that the defendant signed the document. Thus, the defendant's contention is without merit.

## VI.

The defendant alleges that the Court erred in admitting the testimony of Agent Singer, of the Internal Revenue Service, as to conversations with and admissions by one O'Malley, the defendant's accountant and attorney-in-fact. There is no dispute that O'Malley was the individual to whom Government agents were directed and referred by the defendant. O'Malley was the defendant's representative and agent acting within the scope of his authority. O'Malley so testified. (Pre-trial transcript # 1, June 16, page 45). The defendant so testified. (Pre-trial transcript # 1, June 16, Pages 4, 11 and 15). O'Malley operated pursuant to powers of attorney duly signed (G–247–50). O'Malley prepared and, as preparer, signed the defendant's income tax returns. The statements or admissions by O'Malley, as the agent representative and attorney-in-fact were clearly admissible under the doctrine of Vicarious Admissions. See Rule 63(9) (a) of the Uniform Rules of Evidence; Koninklijke Luchtvaart Maatschappij N. V. KLM, etc. v. Tuller, 110 U.S.App.D.C. 282, 292 F.2d 775 (1961); Slifka v. Johnson, 2 Cir., 161 F.2d 467 (1947); United States v. Massei, 1 Cir., 214 F.2d 895, 902 (1957); United States v. Dolleris, 6 Cir., 408 F.2d 918 (1969); cert. denied 395 U.S. 943, 89 S.Ct. 2014, 23 L.Ed.2d 461 (1969); Epstein v. United States, 6 Cir., 246 F.2d 563, 570, 571 (1957). The doctrine is not new. It is not of recent origin. In Cliquot's Champagne, 3 Wall. 114, 70 U.S. 114, 18 L.Ed. 116, the Court stated as follows:

"Whatever is done by an agent, in reference to the business in which he is at the time employed, and within the scope of his authority, is said or done by the principal and may be proved in a criminal as in a civil case in all respects, as if the principal were actor or the speaker * * * ".

It is currently approved (see the preliminary draft of proposed Rules of Evidence for the United States District Courts—Committee's Report, March 1969, at pages 160 and 169). The doctrine of vicarious admissions is alive and well. It was clearly applicable in this case. The defendant has cited no cases to the contrary. The testimony in question was admissible. Its weight was for the jury.

For the reasons already stated, the defendant's continued contention that O'Malley was entitled to the *Miranda* warnings is rejected.

## VII.

For the reasons already stated, G–231, a "Q&A" statement given by

728

O'Malley, was properly admitted. For the *first* time the defendant *now* contends that it contained inflammatory material in that O'Malley referred to the defendant as a good family man and churchman and suggested that he was not a racketeer or gangster. Aside from the fact that the objection comes too late, the fact is that O'Malley sought to attest to the defendant's virtues and read in its entirety G–231 is not inflammatory.

## VIII.

The *Holland* case, *supra,* imposes upon the Government as we have already stated, the burden, duty and obligation to show a "likely source" from which the jury could reasonably find that the alleged net worth increases sprang. Seeking to meet this obligation and burden, the Government called one Ludwig Iskra, who testified, inter alia, that he "took bets" for the defendant. (Notes of testimony, page 1587). The defendant contends that such testimony may have been perjured, that it was equivocal, vacillating, unworthy of belief, emotional and obtained under pressure by Government agents. The credibility and weight of his testimony was for the jury. There is no doubt as to its admissibility. Holland v. United States, *supra;* United States v. Johnson, 319 U.S. 503, 515, 517, 63 S.Ct. 1233, 87 L.Ed. 1546 (1943); United States v. Costello, 2 Cir., 221 F.2d 668 (1955).

## IX.

The defendant contends that he was prejudiced by the admission of Government charts (G–324–338). The use of charts, not as evidence, but as an aid to the jury, has been approved. United States v. Johnson, 319 U.S. 503, 519, 63 S.Ct. 1233, 87 L.Ed. 1546 (1943); Gariepy v. United States, 6 Cir., 189 F.2d 459, 462 (1951). In Smith v. United States, 6 Cir., 239 F.2d 168 (1956), the Court said as follows:

" * * * The admission of such tabulations as an aid to the jury does not constitute reversible error. It has been approved by this court in recent cases of income tax evasion. In Gariepy v. United States, 6 Cir., 189 F.2d 459, 462, the court declared that the computation was at best 'but an estimate, but as an estimate it was entitled to the consideration of the jury because based on substantially the entire evidence in the record'. Cf. Eggleton v. United States of America, 6 Cir., 227 F.2d 493; American Vitrified Products Co. v. Wyer, 6 Cir., 221 F.2d 447. The use of such calculations was approved by the Supreme Court in United States v. Johnson, 319 U.S. 503, 519, 63 S.Ct. 1233, 1241, 87 L.Ed. 1546. The record shows that within the holding of the *Johnson* case the trial court herein left the jury 'free to exercise its untrammeled judgment upon the worth and weight' of· the evidence given in these charts."

Such practice has been approved particularly in income tax evasion cases which are long, cumbersome and sometimes involve complex and complicated figures and calculations. This was such a case. It involved over 3400 pages of testimony, over 326 exhibits, over 120 witnesses who testified over a three-month period, eleven years of financial history and transactions, multiple checking accounts, multiple savings accounts, four separate businesses, at least six pieces of real estate, stock in several corporations, loans, automobiles and furniture. To have denied the use of charts would obviously have been an error. Both the prosecution and the defense were allowed the use of charts, subject to appropriate jury instructions, and each was given ample time to study the charts of the other and become acquainted with the details thereof.· We conclude that the use of charts by both sides was proper.

## X.

The defendant objects to the *content* of the Government charts (G–324–338). The charts were the subject of considerable testimony explaining in

detail to the jury the source of the information, the basis for the various items therein contained, the method of calculation followed, etc. They did not and they need not in each instance give effect to the contentions of the defendant. In Flemister v. United States, 5 Cir., 260 F.2d 513 (1958), the Court said "A summary, to be admissible, we think need not give effect to the contentions of the accused". This was left to summaries offered by the defendant. The Government's charts were what they purported to be as explained in detail by Government witnesses. They were not subject to the infirmities discussed in United States v. Altruda, 2 Cir., 224 F.2d 935 (1955). The jury was carefully charged as to the function and use of the charts (P. 4153). We do not believe the use of the charts invaded the jury function and we do not believe the charts are or were objectionable because they did not embody all the evidence which *the defendant* would have included in the manner and form in which he would have treated it. The defendant was given the opportunity to submit his own charts. See Myers v. United States, 5 Cir., 356 F.2d 469 at page 470 (1966) where the Court stated:

> "Although the summary does not include all the evidence, or Appellant's theories of the evidence, it does not purport to. See Flemister v. United States, 5 Cir., 1958, 260 F.2d 513. It does not contain anything not in the record, United States v. Ward, 3 Cir., 1948, 169 F.2d 460, and identifies in detail the evidence summarized, Lloyd v. United States, 5 Cir., 1955, 226 F.2d 9. Finally, in view of its contents and the Judge's instructions regarding its use, this summary did not usurp the province of the jury. Steele v. United States, 5 Cir., 1955, 222 F.2d 628."

Likewise see Smith v. United States, 8 Cir., 236 F.2d 260 (1956).

### XI.

Increases in net worth may result either from an increase in assets or a decrease in liabilities. Through the testimony of the defendant's accountant and others, the Government established that the defendant's liabilities decreased in 1961, 1962 and 1963 in the manner following and in the amounts stated:

1. An alleged mortgage payable to the defendant's father in the amount of $10,000.00.

2. An alleged loan payable to Norman Meyers in the amount of $19,700.00.

3. An alleged loan payable to the defendant's father in the amount of $10,000.00.

The defendant argues that the Government failed to establish that the funds with which these liabilities were liquidated specifically came from taxable income. In a prosecution of this kind such precise and specific burden does not rest upon the Government. *Holland* prescribes that the Government shall establish a " * * * likely source, from which the jury *could* reasonably find that the net worth increases sprang * * * ". (348 U.S. pages 137 and 138, 75 S.Ct. pages 136 and 137) As the *Holland* court said (p. 137, 75 S.Ct. p. 136) " * * * Increases in net worth, *standing alone,* cannot be assumed to be attributable to currently taxable income". But here the increase in net worth resulting from a decrease in liabilities does *not* stand alone. The Government has shown a "likely source" from which may have come the money to reduce liabilities and from that the jury may or may not find that the increase was from currently taxable income, from a cash hoard or from under the rug, the mattress or the safe deposit box as defendant's counsel suggested in his opening remarks. It is a question for the jury and when the defendant now argues that there is no basis for the inference that taxable income was used in reducing said liabilities, he quarrels with the very substance of the net worth method and invades the function of the jury. His quarrel is with the jury, its inferences and its findings, not with the Government, the evidence or the rulings

**730**

of the Court. His argument is without merit.

## XII.

■■ Pointing again to the three items discussed in the preceding subdivision (XI), plus G–90, (see subdivision V, supra) the defendant contends that they represent post-offense admissions which have not been corroborated as required by law. Smith v. United States, 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192 (1954). He looks for specific corroboration of each specific item and overlooks the fact that in income tax evasion cases corroboration may be found, as here, in greatly increased visible assets at a time when the taxpayer is receiving unrecorded income. United States v. Calderon, 348 U.S. 160, 75 S.Ct. 186, 99 L.Ed. 202 (1954):

"* * * an inference of tax evasion could be based on the fact that the taxpayer's visible assets greatly increased at a time when he was receiving unrecorded income * * *".

In Opper v. United States, 348 U.S. 84, 93, 75 S.Ct. 158, 99 L.Ed. 101 (1954) the Court said:

"* * * we think the better rule to be that corroborative evidence need not be sufficient, independent of statements, to establish the corpus delicti * * *".

Passing over the fact that G–90 was obtained in connection with an unrelated proceeding and may not need corroboration (Smith v. United States, supra) the fact remains that as to this and the other three items specified by the defendant, corroboration rests in the proof by the Government that defendant (a) received *unrecorded* amounts of taxable income,[11] and (b) realized a substantial increase in visible assets.[12] The language used by the Supreme Court in *Calderon, supra,* becomes pertinent (348 U.S. p. 166, 75 S.Ct. p. 189):

"The increments, when considered in the light of the respondent's receipt of unrecorded amounts of taxable income, are sufficiently at variance with his reported income to support an inference of tax evasion."

At page 167, 75 S.Ct. page 190, the Court said:

"We hold that the financial history of respondent and his business during the prosecution years provides sufficient independent evidence of the crime of tax evasion to corroborate his statements * * *".

And at page 169, 75 S.Ct. page 190:

"* * * although the evidence was insufficient to corroborate the opening net worth directly, *we find the independent proof of tax evasions adequate.*" (Emphasis ours.)

Therefore, post-offense admissions were properly and sufficiently corroborated and a directed verdict or judgment of acquittal was not and is not justified on this record.[13]

11. Numbers operations testified to by witness Iskra, and crap game testified to by witness Skelly.

12. Based on the record, the Government calculates such increase as follows at page 49 of its brief: "* * * During the prosecution years 1961–1963, Parenti's assets increased from $94,956 to $210,987, or $116,031. During this same period he made personal, non-deductible expenditures of $104,029. In short, his assets increased by $116,031, and he had personal expenses of $104,029, a total of $220,029. In 1961, 1962 and 1963 he reported taxable income of $109,726, a difference of $111,028."

13. Additional corroboration, not essential to the disposition of the defendant's motion, may be found in the record as a whole and, although arguable, is worthy of consideration.

First, apparently nothing was paid to defendant on account of the sale of Market Motors in 1962. This suggests that the parties were treating the transfer as a satisfaction of a liability of defendant to Meyers.

Second, during the course of the prosecution years, the Government established, independent of the defendant's admissions, that his records of his gambling activities were poorly maintained and incomplete and that during the course of

## XIII.

Reiterating lack of corroboration and restating alleged defects in G–243 (the net worth statement) the defendant contends, for the same reasons previously treated at length, that the Government failed, therefore, to establish a reasonably firm starting point upon which to base net worth computations. No purpose would be served by repeating what we have heretofore stated. We are convinced the contention is without merit.

## XIV.

Once again, the defendant urges a judgment of acquittal. He quarrels with the theory of the net worth method, its application and its results. Said method has been approved by the Supreme Court and he cannot here set it aside.

Again ignoring substantial portions of the record, he argues [14]:

"A reading of a vast majority of net worth cases reveals that they have a common factual thread running through all of them. A vast majority of cases contain either one or a combination of the following facts:

1. The government can establish large expenditures of cash on the part of the defendant.

2. The government establishes the failure of the defendant to keep proper and adequate books and records.

3. The government is able to establish a likely source for the alleged untaxed income.

4. The defense almost invariably raised in these type cases is based upon alleged existence of a substantial cash hoard .on hand at the starting point.

"It should be noted that none of the above factors existed in the present case ' * * * ".

He thus asks the Court to invade the fact-finding field and usurp the functions of the jury. The fact is

1. that the Government did establish substantial expenditures of cash;

2. that "books and records" were not kept or at least poorly kept as to income from . gambling activities;

3. that the Government did establish likely source or sources of unreported income; and

4. a substantial cash hoard was alleged at the very inception of the case, although never established [15]. In any event, the burden rests upon the Government to establish a "likely source" (United States v. Holland, *supra*) or negate non-taxable sources of income (United States v. Massei, .355 U.S. 595, 78 S.Ct. 495, 2 L.Ed.2d 517 (1958).) In this case, it did both. The defendant's motion is without merit.

the prosecution years the defendant's assets were increasing well in excess of that which could be attributed to his reported income for the same period. These two factors alone tend to establish the crime of income tax evasion independent of the net worth method. United States v. Calderon, 348 U.S. 160, 75 S.Ct. 186, 99 L.Ed. 202 (1954).

Third, even assuming the liabilities in question are disregarded, there remains a substantial deficiency for the *three* prosecution years which constitutes corroboration. United States v. Calderon, *supra*. But the defendant maintains that if we disregard the payment of the alleged liability to Norman Meyers, the deficiency for the calendar year 1962 would be wiped out and the defendant

could not be convicted for that· year. However, the court in United States v. Calderon, *supra*, indicated quite clearly that if the record shows an overall deficiency for the prosecution years, even though the deficiency for one of those years would be wiped out if the post-offense admissions are disregarded, there is sufficient corroboration to support a conviction for *all* of the prosecution years.

14. See pages 111 and 112 of defendant's brief.

15. The Government may have eliminated a "cash hoard" by its proofs as to funds received and applied from 1952 through 1960.

## XV.

Reverting again to the net worth statement (G–243) the defendant again insists that it was procured by fraud, trickery and deceit. We have already discussed this issue at length (II, supra) and we shall not here repeat our prior observations except to again state that trickery, fraud, deceit, guile and misrepresentation were not and are not in this case except for the purpose of this motion [16]. The defendant now suggests a special interrogatory to the jury on the question of trickery, fraud or deceit in the procurement of G–243 and other statements. The simple answer is that the issue was not involved. Unlike Smith v. United States, 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192 (1954), no promises were made by Government agents "to close the case" (p. 150, 75 S.Ct. 194); no representations were made that the investigation related to civil liability only and no suggestions were made or impressions left that the Government would do any less than follow its usual practices and procedures. A specific jury instruction as to fraud, trickery or deceit was no more warranted on this record than an instruction relating to forgery which admittedly was not in the case. The Court owes some duty to the jury not to confuse it with instructions which are neither relevant nor related to the evidence in the case and the issues raised thereby.

Further answer rests in the fact that the jury was specifically instructed to consider "all of the circumstances surrounding the procurement of those (the) admissions" in question (page 4151). It was instructed that "an act, or failure to act is knowingly done * * * if it is done voluntarily * * * and not because of mistake, accident or other reason (page 4157)." The defendant's contention is without merit.

## XVI.

In this instance, the defendant levels a broadside at the charge of the Court. We charged at length as to the presumption of innocence (page 4146 et seq.). We charged in detail as to the burden resting upon the Government (p. 4147 et seq.). We charged carefully as to "reasonable doubt" (p. 4147) and we charged that if the evidence "reasonably permitted either of two conclusions, one of innocence and the other of guilt, the jury should, * * * adopt the conclusion of innocence". (P. 4148) We charged as to "reasonable inferences" to be drawn from the evidence (p. 4149) and we sought to properly charge as to "net worth" (pages 4164 and 4165). Where the points or requests properly stated the law, we so charged although not necessarily always in the precise verbiage requested. Where the point or request incorrectly stated the law or where it was too broadly stated, we denied. We think the charge was adequate.

## XVII.

The defendant here reasserts all objections and motions made at time of trial and on the basis thereof presses his motion for a judgment of acquittal or in the alternative for a new trial. Having again considered the record, as requested by the defendant, we are irresistibly drawn to the conclusion that his motion is without merit.

---

16. The Government has labeled it a "gratuitous red herring". (See page 54 of the Government's brief.)