UNITED STATES of America
v.
Norman PAWLAK, Defendant.
No. 71 Cr. 363.

United States District Court,
S. D. New York.

Aug. 23, 1972.

Whitney North Seymour, Jr., U. S. Atty., Elliot G. Sagor, Asst. U. S. Atty., New York City, for plaintiff.

Louis Bender, New York City, for defendant.

MEMORANDUM

TENNEY, District Judge.

From February 4, 1972 until February 18, 1972 the defendant Norman Pawlak (a/k/a Norman Paris) was tried before this Court without a jury on four counts of violating 26 U.S.C. § 7201 which provides that "[a]ny person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall . . . be guilty of a felony . . . ." Specifically, indictment 71 Cr. 363 charges that the defendant willfully attempted to evade his income taxes for the years 1964–67. Employing the bank deposits method of proof, the Government, as will be demonstrated *infra,* has proven the defendant's guilt beyond a reasonable doubt.

■ The essential elements of the crime are three: (1) an additional substantial tax must have been due and owing; (2) the defendant must have attempted to evade or defeat the tax; and (3) the attempt must have been *willful.* Sansone v. United States, 380 U.S. 343, 351, 85 S.Ct. 1004, 13 L.Ed.2d 882 (1965); Holland v. United States, 348 U.S. 121, 139, 75 S.Ct. 127, 99 L.Ed. 150 (1954); Spies v. United States, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418 (1943); United States v. Coppola, 425 F.2d 660, 661 (2d Cir. 1969); United States v. Levy, 326 F.Supp. 1285 (D.Conn.), aff'd, 449 F.2d 769 (2d Cir. 1971).

■ The defendant has conceded that the Government established the first element, that a substantial additional tax is owing (Memorandum of Law at 1–2) although defendant does question the total amount. The Government, however, need not prove the precise amount by which defendant understated his income. "[T]he prosecution meets its burden when it shows that income was underreported by a substantial amount." United States v. Marcus, 401 F.2d 563, 565 (2d Cir. 1968), cert. denied, 393 U.S. 1023, 89 S.Ct. 633, 21 L. Ed.2d 567 (1969). The Government has shown that a breakdown of defendant's income and tax liability over the four years in question is as follows:

Summary of Alleged Taxable Income & Tax Liability

Taxable Income

| Year | Per Return | Corrected | Increase |
|------|-----------|-----------|----------|
| 1964 | $ 42,681.28 | $102,268.37 | $ 59,587.09 |
| 1965 | 33,037.29 | 90,331.55 | 57,294.26 |
| 1966 | 17,921.61 | 66,568.58 | 48,646.97 |
| 1967 | 25,297.82 | 39,261.54 | 13,963.72 |
| Total | $118,938.00 | $298,430.04 | $179,492.04 |

Tax Liability

| Year | Per Return | Corrected | Deficiency |
|------|-----------|-----------|-----------|
| 1964 | $ 14,254.05 | $ 49,377.12 | $ 35,123.07 |
| 1965 | 9,095.66 | 39,378.93 | 30,283.27 |
| 1966 | 3,798.05 | 25,832.72 | 22,034.67 |
| 1967 | 6,127.22 | 11,807.69 | 5,680.47 |
| Total | $ 33,274.98 | $126,396.46 | $ 93,121.48 |

Thus, the amounts of tax due and owing for each of the years 1964–67 are: $35,123.07; $30,283.27; $22,034.67; and $5,680.47 for a total of $93,121.48. These are without doubt "substantial" amounts. *See* United States v. Siragusa, 450 F.2d 592 (2d Cir. 1971), cert. denied, 405 U.S. 974, 92 S.Ct. 1195, 31 L. Ed.2d 248 (1972).

■ The Government has also met its burden with respect to the second element since the filing of a false or fraudulent income tax return constitutes an "attempt" within the meaning of the statute, United States v. Coppola, *supra,* 425 F.2d at 661, and there is no doubt the returns for 1964–67 were false and fraudulent. *See also,* Sansone v. United States, *supra,* 380 U.S. at 352, 85 S.Ct. 1004, 13 L.Ed.2d 882; United States v. Magnus, 365 F.2d 1007 (2d Cir. 1966), cert. denied, 386 U.S. 909, 87 S.Ct. 856, 17 L.Ed.2d 783 (1967); United States v. Raub, 177 F.2d 312, 315 (7th Cir. 1949).

■ The crucial issue at trial was the question whether the defendant acted *willfully* in filing or causing to be filed the false returns for 1964–67. Did the defendant despite knowing that he had a legal duty to pay the tax due nevertheless voluntarily, intentionally and with the specific and fraudulent intent to conceal his true income file these false returns? United States v. Dowell, 446

F.2d 145, 147 (10th Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 448, 30 L.Ed.2d 368 (1971); Hayes v. United States, 407 F.2d 189, 195 (5th Cir.), cert. dismissed, 395 U.S. 972, 89 S.Ct. 2133, 23 L.Ed.2d 777 (1969); United States v. Siragusa, *supra,* 450 F.2d at 594. In this regard, it is no defense that the defendant may not have realized the extent by which he understated his income, Katz v. United States, 321 F.2d 7, 10 (1st Cir.), cert. denied, 375 U.S. 903, 84 S.Ct. 193, 11 L. Ed.2d 144 (1963). The fact question for this Court is simply whether defendant knew "that he should have reported more income than he did for the [years involved]." Sansone v. United States, *supra,* 380 U.S. at 353, 85 S.Ct. at 1011.

■ The Government can prove defendant acted willfully either through the use of direct evidence such as admissions by the defendant or through the use of circumstantial evidence which gives rise to inferences that the defendant acted willfully. United States v. Spinelli, 443 F.2d 2 (9th Cir. 1971). Both types of evidence were employed in this case.

The most damaging evidence offered by the Government of willfulness were the admissions of the defendant to Revenue Agent Lem in the presence of the defendant's preparer Thomas Axt at a meeting that occurred on August 2, 1968 in Mr. Axt's office. Specifically, Lem testified that when asked how he could account for the large excess of deposits into just one of his bank accounts, the Chemical Bank checking account, over the amount reported as income on his 1966 return, Mr. Pawlak replied that when he prepared the return he only included those employers and clients who actually sent him forms 1099 and W–2 and that although he knew some employers did not send these forms, he did not include them. (Tr. 109). The defendant indicated that he did not know how much he failed to report and was apparently surprised to find that the amount was so great. The defendant also told Agent Lem that he had been following this practice for years. (Tr. 110).

The defendant's attorney characterized Lem's testimony as extremely harmful (Tr. 191) and so has, of course, attacked the credibility of Lem by pointing out alleged inconsistencies in his testimony and by suggesting that Lem, a man of Chinese ancestry, may have had difficulty understanding English which would account for his alleged misunderstanding of what defendant claims he actually said at the August 2, 1968 meeting. The Court, however, during the course of the trial had the opportunity to note that Mr. Lem had been in this country since 1941 and there was no evidence during his testimony of any language difficulty. (Tr. 191). With regard to the alleged inconsistencies in Lem's testimony, they have been adequately explained by the Government and need not be discussed in detail. (Government's Reply Memorandum at 17–25). Suffice it to say that the Court directly observed Mr. Lem at trial both on direct and cross-examination and found him to be a credible witness. Defendant's contention that Lem was less than candid with the Court is without merit.

■ Defendant claims, however, assuming that Lem is believed, there is no independent evidence corroborating the defendant's admissions, as required by Smith v. United States, 348 U.S. 147, 155, 75 S.Ct. 194, 99 L.Ed. 192 (1954). The independent evidence, however, need only establish either that the admissions were reliable or that the crime charged was in fact committed. United States v. Marcus, *supra,* 401 F.2d at 565. The Government's evidence amply meets this requirement especially the evidence of consistently large understatements, the supplemental lists of income not backed by W–2's or 1099's which were prepared by defendant (Gov.Exs. 1756, 1726B), and the fraud referral report of Agent Lem dated October 10, 1968 which also makes reference to these admissions.

(Gov.Ex. 8C). Smith v. United States, *supra,* 348 U.S. at 157, 75 S.Ct. 194, 99 L.Ed. 192; United States v. Parenti, 326 F.Supp. 717, 725 (E.D.Pa.1971). Certain statements of Thomas Axt were also testified to by both Lem and Agent Alleva under the theory that Axt was acting within the scope of his employment and authority when they were made and thus the statements were admissible against defendant.[1] Hayes v. United States, *supra,* 407 F.2d at 192; United States v. Parenti, *supra,* 326 F. Supp. at 727, 729. While the reasons behind the corroboration rule would not appear to apply to the statements of Axt since their reliability should not be suspect, *see* Smith v. United States, *supra,* 348 U.S. at 153, 155 n. 3, 75 S.Ct. 194, 99 L.Ed. 192, the evidence of the Government amply bolsters the statements of Axt as well and indicates that the crime was in fact committed.

■ As well as relying on these admissions of the defendant and the statements of his agent, Axt, the Court has drawn an inference adverse to the defendant by reason of his failure to call Axt as a witness. While defendant has argued that where a witness is equally available to both sides no inference should be drawn against either side, the rule in this circuit is to the contrary, especially where the witness would naturally side with one party. United States v. Dibrizzi, 393 F.2d 642, 646 (2d Cir. 1968); United States v. D'Angiolillo, 340 F.2d 453, 457 n. 5 (2d Cir.), cert. denied, 380 U.S. 955, 85 S.Ct. 1090, 13 L.Ed.2d 972 (1965); United States v. Cotter, 60 F.2d 689, 692 (2d Cir. 1932) (L. Hand, C. J.); United States v. Krechevsky, 291 F.Supp. 290, 293 n. 3 (D.Conn.1967). Since Mr. Axt had been defendant's preparer for a number of years including those covered by the indictment, and is now defendant's accountant as well as preparer, he would naturally have sided with him. In fact, Mr. Alleva testified on cross-examination that Axt did send a letter dated April 1970 to the IRS, and while neither the letter nor its substance were admitted into evidence, defendant made it clear that Axt was siding with him. (Tr. 459–463). The inference against defendant, then, is quite proper.

■ In addition to the direct evidence of defendant's willful conduct, the Government offered substantial circumstantial evidence of willfulness. While evidence of a single understatement of income is not alone evidence of willfulness, a consistent pattern of underreporting large amounts of income is evidence from which willfulness can be inferred. Holland v. United States, *supra,* 348 U.S. at 139, 75 S.Ct. 127, 99 L.Ed. 150; United States v. Frank, 437 F.2d 452, 453 (9th Cir.), cert. denied, 402 U. S. 974, 91 S.Ct. 1661, 29 L.Ed.2d 139 (1971); United States v. Procario, 356 F.2d 614, 618 (2d Cir.), cert. denied, 384 U.S. 1002, 86 S.Ct. 1923, 16 L.Ed.2d 1015 (1966). *See also,* H. Balter, Tax Fraud and Evasion § 13.3–4 (3rd Ed. 1963). Inasmuch as Mr. Pawlak failed to report nearly $180,000.00 over a four year period, the evidence on this score is practically overwhelming.

■ Large nondeductible payments or expenditures are also circumstantial evidence of knowledge and willfulness. United States v. Dowell, *supra,* 446 F.2d at 147. At trial the Government offered evidence that the defendant spent or placed in savings accounts the following amounts over and above the income reported on his returns for the years 1964–67, respectively: $60,204.33;

---

1. The statements of Mr. Axt to agents Lem and Alleva have been admitted for all four years. At trial, the statements of Axt were limited to 1966 and the Court reserved on the other years. The evidence, consisting in part of Mr. Pawlak's statement to Alleva in the presence of Axt to call Axt if Alleva needed anything (Tr. 272), the power of attorney signed by Mr. Pawlak appointing Mr. Axt as his representative and Mr. Axt's possession of the defendant's records and his preparation of the returns for the four years, establishes that Axt was the agent of Mr. Pawlak for the years 1964–67.

$54,361.23; $48,392.26; and $15,942.08. In fact, during 1964, 1965 and 1967 defendant deposited in savings accounts in his name alone checks he had drawn on the Chemical Bank in the sum of $70,000.00. One deposit alone was for $25,000.00. Clearly his spending and depositing these sums of money belie defendant's argument that he was unaware of how much he actually earned and that he thought he had reported all of his income.

Failure to include all of his income in the records he provided his preparer Axt is further evidence of the willful nature of defendant's conduct. United States v. Frank, *supra;* United States v. Dowell, *supra,* 446 F.2d at 147; United States v. Lindstrom, 222 F.2d 761, 763 (3d Cir. 1955). The evidence at trial demonstrated that defendant provided Axt only with W-2's, 1099's and a short supplemental list of employers who had not provided him with such statements. Agent Alleva testified that Axt had told him that bank statements which reflected Mr. Pawlak's income were never made available to him. (Tr. 442). Although defendant claims they were not complete he also failed to provide Axt with either his ledger or his diary both of which at least to some degree reflected his engagements and the payments he received. United States v. Procario, *supra,* 356 F.2d at 618. Defendant's failure to include on the supplemental list more than $179,000.00 of unreported income for the four years, under the circumstances, can be inferred to be more than negligence. United States v. Dowell; *supra,* 446 F.2d at 147.

Additional circumstantial evidence that the defendant was aware of his financial situation and in contrast to his contention that he was a musician who was helpless when dealing with financial matters is the relatively complete record of business expenses and deductions he was able to compile during the four years. The evidence demonstrated that defendant took deductions of $218,300.00 during 1964-67 and that a great deal of that was backed by documents consisting of 1253 checks and 393 paid bills, on many of which defendant had noted the nature of the business expense. Mr. Pawlak also kept records of several business expenses that had been paid in *cash.* (Defendant's Reply Memorandum at 25). While defendant counters that he did not take all of his deductions (Defendant's Reply Memorandum at 26), those few that he omitted pale into insignificance when compared to the $218,300.00. Moreover, his not claiming his mother as a dependent was done for personal reasons not because he overlooked it or was unable to handle his financial affairs.

Defendant, on the other hand, argues that the Government has not shown any conduct on his part of the type from which the Supreme Court held an affirmative willful attempt could be inferred. Spies v. United States, *supra.* It must first be pointed out, however, that the list given by the Court in *Spies* was by way of example only and was not intended to be exhaustive. Moreover, the Government has analogized several of defendant's acts to those listed by the Court. In *Spies,* the Court stated that an

"affirmative willful attempt may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal." 317 U.S. at 499, 63 S.Ct. at 368.

By way of analogy the Government argues that: (a) defendant's supplemental list of income can be considered a false document; (b) the records defendant provided Axt were one set of books while these same records, his ledger, his diary and his bank statements constituted a second set of books; (c) the ledger, diaries, invoices and correspondence

were never shown to the preparer and were destroyed;[2] (d) defendant has been quite effective in concealing the sources of his income and at trial was able to offer no hint as to where the excess bank deposits may have originated; and (e) defendant who served as his own bookkeeper and secretary handled his affairs, as represented by the arrangement with Coronado Service Co., whereby the transaction as reported by defendant on his income tax return differed from the real effect of such transactions on his profits and losses.[3] These arguments of the Government are not without merit and when taken together certainly support an inference of willfulness.

The Government has also pointed to certain evidence of willfulness which occurred subsequent to the actual affirmative acts of filing the returns. The failure of the defendant to supply his ledger book to Agent Lem is evidence of such willfulness. United States v. Eley, 314 F.2d 127, 132 (7th Cir. 1963). Other such evidence includes the instances of false statements to Government agents,[4] and defendant's admission at one point that he was notified by Axt prior to April 15, 1968 of the pending IRS audit of his 1966 return and his subsequent filing of an extension of time to file the 1967 return, and the augmented supplemental list attached to

---

2. Mr. Pawlak contended at trial that his ledger book was stolen in a mugging incident shortly before Labor Day, 1968. While defendant may have been mugged, it is unlikely that he would have been carrying his ledger book that night and there is no mention of the book in the police report covering the mugging. Furthermore, Mr. Pawlak at the August 2, 1968 meeting did not show the ledger, which he allegedly carried with him at all times, to Agent Lem and never mentioned it. Even defendant's corroborating witnesses, Doctor Ruddick and Mr. Dahaney, appear to be referring in their testimony to Mr. Pawlak's appointment diary rather than his ledger. Finally, the loss of the ledger occurred at a particularly suspicious time, coming as it did on the heels of Lem's meeting with Mr. Pawlak.

3. Defendant utilized Coronado Service Company as a conduit for the payment of the expenses incurred in doing a job. If the advertising agency employing defendant for a job, e. g., a jingle, were not a signator to the union contract Coronado would send defendant a bill for all of the expenses incurred in the production including his salary. Mr. Pawlak would then pay that invoice and in return receive from Coronado his salary and a W-2. Subsequently, the advertising agency would reimburse defendant for the amount of the Coronado bill. The effect of this arrangement was that defendant netted his salary as represented by the W-2 from Coronado. On his income tax returns, however, defendant deducted the amount of the Coronado invoice as a business expense and yet failed to include as income the amount of the reimbursement from the advertising agency. Thus, defend-

ant's return showed that he incurred a loss on the job whereas he made a profit. See Tr. 999–1048. It is reasonable to assume that a great deal of defendant's unreported income may have come from similar arrangements as the one diagrammed in Gov.Ex. 11AA. It is also interesting to note at this point that defendant functioned as his own bookkeeper and producer for these arrangements, and that although he claims to be naive when dealing with financial matters, his testimony concerning the rather complicated Coronado arrangement indicates that he understood it and its variations quite well.

4. While the defendant claimed he did not know of the IRS audit until shortly before the August 2, 1968 meeting with Lem there is strong evidence that he did know much earlier as evidenced by his signing the April 12, 1968 extension for filing after Axt had received Lem's notice of the pending audit and by defendant's signing of the power of attorney appointing Axt to represent him in connection with the 1966 return. Also, defendant said he expected all of his employers to send him 1099's and yet he testified that he himself did not send them to his musicians; defendant testified that Axt always asked for his bank statements and yet Alleva testified that Axt never received them; defendant testified that he told Alleva about the ledger and the mugging incident and yet Alleva testified to the contrary; defendant also testified that he signed all of his income tax returns in blank and never saw them or went over them before Axt sent them to the Government and yet Axt informed Alleva that the defendant did go over the returns and they were not signed in blank. (Tr. 441).

the 1967 return.[5] The argument is that this conduct creates the inference that defendant was aware that he earned income for which he did not receive a statement, that he decided in April 1968 he should report more of his income in light of the IRS audit of his 1966 return and that he had the records from which he could compile a more complete record of income than he had in former years.

Defendant attempts to explain the 1967 supplemental list by saying that the nature of his business had changed. While the defendant did refer to a couple of events during 1967 that he claims made it easier for him to recall his employers, his story on the whole was not credible.[6] Furthermore, despite his contentions to the contrary and the testimony of defendant's psychiatrist, Doctor Ruddick, defendant appeared to have a good memory that he was careful to exercise only at convenient times. The evidence also indicated defendant got along remarkably well in society for a man who allegedly was a "babe in the woods." During the time period in question defendant was an arranger, composer, performer and producer; he was his own bookkeeper, secretary and business manager; he dealt constantly with a number of people, night clubs and companies; he employed musicians and operated a publishing company; he maintained numerous bank accounts, kept a running balance in his check book, kept a diary and a ledger and mailed invoices, copies of which he maintained until paid; he also provided his accountant with statements from employers and a supplemental list of income and kept nearly complete rceords of his expenses, purchased his own home, and as testified to by his character witness Chester Feldman was generally quite reliable and dependable. This is not the picture of a helpless, passive, fearful and anxious musician who was so wrapped up in his work he was incapable of existing in the world of reality as defendant would have the Court believe. The evidence is clear that defendant was capable of willfully attempting to evade his income taxes.

Defendant has raised a number of defenses. The first is that his attempt to evade paying his tax could not have been willful since he never attempted to conceal his income but merely put it into bank accounts where it could be easily discovered. If that were a defense, however, the Government would never be able to succeed in proving its case by the bank deposits method.

Defendant has also offered the testimony of his psychiatrist, Dr. Ruddick, in support of his claim that he could not have acted willfully. The Court, however, has been unable to give much weight to Dr. Ruddick's testimony in light of defendant's decision not to claim insanity as a defense, United States v. Freeman, 357 F.2d 606, 622–623 (2d Cir. 1966), and the general rule in this circuit that psychiatric testimony is not admissible solely on the issue of willfulness. United States v. D'Anna, 450 F.2d 1201, 1204–1205 (2d Cir. 1971); United States v. Baird, 414 F.2d 700, 703–704 (2d Cir. 1969), cert. denied, 396 U.S. 1005, 90 S.Ct. 559, 24 L. Ed.2d 497 (1970). In fact Dr. Ruddick himself testified that defendant did not lack any substantial capacity to conform his conduct to the requirements of the IRS laws and that he believed that Mr. Pawlak did realize he had to report all of his income. (Tr. 779). While there is some authority for defendant's offer of psychiatric testimony on the issue of willfulness, Rhodes v. United States, 282 F.2d 59 (4th Cir.), cert. denied, 364 U.S. 912, 81 S.Ct. 275, 5 L.Ed.2d 226 (1960),

---

5. The supplemental list attached to defendant's 1967 return included 17 employers from whom defendant had not received a statement of earnings whereas in 1965 and 1966 he had listed only four such employers and in 1964 included none. Furthermore, the amount of income he had report-ed on his supplemental list in 1964–1966 was an insignificant percentage of the total reported professional income in those years and yet in 1967 defendant was able to report on the supplemental list 34% of his total gross professional income.

6. *See* note 4 *supra.*

*see also,* United States v. Brawner, 471 F.2d 969 (D.C.Cir.1972) (en banc), the law is otherwise in this circuit and "[b]eing sane, he had the capacity to act willfully." United States v. Haseltine, 419 F.2d 579, 581 (9th Cir. 1969). There is an additional and more fundamental reason, however, for rejecting Dr. Ruddick's testimony. The Doctor testified that the basis for his conclusion that defendant did not act willfully constituted a minimal part of his analysis of Mr. Pawlak and furthermore, Doctor Ruddick was a very biased witness, and much of his testimony just cannot be believed. Even if it could, Mr. Pawlak's apparent anxiety over money to which Doctor Ruddick testified could well explain why defendant did not report all of his income.

Defendant has pointed to other evidence that he claims rebuts the Government's charge that he acted with knowledge and willfulness. Specifically, he refers to his cooperation with the government agents, his good faith reliance on his employers to provide him with W-2's and 1099's for all income he earned, his good faith reliance on his accountant to whom he gave *all* his cancelled checks, bank statements, W-2's, 1099's and for whom he signed his income tax returns in blank, and the testimony of his character witnesses. In support of his claim that he did provide Axt with his bank statements and that he signed his returns and the request for an extension of time in which to file his 1967 return in blank, defendant relies on Ex. Y. and the fact Axt had the bank statements on June 11, 1968.

The Government, however, has adequately responded to these claims. First, since defendant did not supply Axt with all of his records, particularly the bank statements, he cannot claim that he in good faith relied upon his preparer and Axt was not called to testify.[7] *See* Gov.Ex. 1752. Second, Alleva testified that Axt told him that Mr. Pawlak did go over the returns in his office and did not sign in blank.[8] Third, the Government seriously questions defendant's contention that he cooperated and emphasizes that defendant did not provide Agent Lem with the ledger. *See also,* Duke, Prosecutions For Attempts To Evade Income Tax: A Discordant View of a Procedural Hybrid, 76 Yale L.J. 1, 35–36 (1966). Fourth, the evidence does not support defendant's claim that he relied on his employers to send him W-2's and 1099's.

The Government points out that Pawlak's statements to Lem, the use of the supplemental list, the consistent pattern of large understatements of income, the augmented supplemental list for 1967, defendant's use of his ledger all belie defendant's assertion that he in good faith relied on employers to provide him with a statement of *all* income earned. Moreover, defendant, himself, testified that he paid his musicians each year by check and although he deducted their salaries on his return, he never supplied them with a W-2 or 1099. That Axt had the bank statements in June 1968 and January 1969 does not help defendant, since Axt had by that time been requested by Lem to obtain them. Also, Axt denied having them for the preparation of the returns. Finally, Ex. Y is an undated, unauthenticated letter that proves nothing.

In sum, the *combination* of direct and circumstantial evidence in this case proves the third element of the crime charged well beyond a reasonable doubt—that defendant with bad purpose and the specific intent to evade his income tax, willfully and knowingly filed and caused to be filed his 1964, 1965, 1966 and 1967 income tax returns.

Accordingly, and for the foregoing reasons, judgment will be entered finding defendant guilty beyond a reasonable doubt on counts one through four of indictment 71 Cr. 363.

So ordered.

7. Tr. 436–446.

8. *Id.*